John R. DE MALHERBE, Plaintiff,

v.

INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, International Union of Elevator Constructors Local No. 8, National Elevator Industry, Inc., Defendants.

No. C–76–1668–CBR.

United States District Court,
N. D. California.

Sept. 28, 1977.

Dennis John Woodruff, David R. Lipson, San Francisco, Cal., for plaintiff.

Brundage, Beeson & Pappy, Stephen H. Naiman, Richard J. Davis, Jr., Los Angeles, Cal., for defendants IUEC Local No. 8 and IUEC.

Carter, Cook, Phillips & Voltz, Charles E. Voltz, San Francisco, Cal., Putney, Twombly, Hall & Hirson, Charles O. Strahley, New York City, for defendant National Elevator Industry, Inc.

O'Donoghue & O'Donoghue, Patrick C. O'Donoghue, Joyce A. Mader, Washington, D. C., for defendant IUEC.

## MEMORANDOM OF OPINION

RENFREW, District Judge.

Plaintiff, a permanent resident alien of the United States, challenges the refusal of defendants to hire him because of his alien status on the grounds that employment discrimination against aliens violates his rights under 42 U.S.C. § 1981 or, in the alterna-

tive, under the Fifth Amendment of the United States Constitution. Plaintiff invokes the jurisdiction of the Court pursuant to 28 U.S.C. §§ 1343(4) and 1331.

Plaintiff filed his original complaint on August 9, 1976. He filed a first amended complaint on March 4, 1977, and a second amended complaint on June 20, 1977. In his initial complaint, plaintiff sought to represent only himself, but in his first and second amended complaints, he sought to represent a class of similarly situated aliens. On April 14, 1977, defendant International Union of Elevator Constructors ("IUEC") filed a motion to dismiss for failure to state a claim upon which relief can be granted under § 1981, for lack of subject-matter jurisdiction due to pre-emption by the National Labor Relations Board, and for failure to state a claim for damages for emotional distress under California law. Also on April 14, 1977, defendant National Elevator Industry, Inc. ("NEII"), filed a motion to dismiss, this one for insufficient service of process and lack of prosecution, for lack of subject-matter jurisdiction or failure to state a claim upon which relief can be granted. NEII also moved to strike the class-action allegations because plaintiff failed to obtain leave of court to include them when he amended his initial complaint. Plaintiff has filed a memorandum in opposition, and defendants have responded to that memorandum. The Court therefore has the benefit of fairly extensive briefing, especially on the statutory history of § 1981.

Plaintiff is a permanent resident alien of the United States, born in Uruguay and a citizen of that country. He was employed in the elevator construction industry pursuant to a work permit issued by Internation-

al Union of Elevator Constructors Local No. 8 ("Local 8") for various times between 1969 and 1972. Plaintiff again sought work in the industry in the spring of 1974. He also sought admission into the Elevator Industry National Recruitment and Training Program ("EINRTP"). Plaintiff took and passed the test for admission into EINRTP and was placed on the hiring list of Local 8.[1] NEII, the bargaining representative of a multi-employer bargaining unit, agreed with IUEC that employers in the industry would hire only individuals on the hiring list, and the hiring list includes only union members and nonmembers who have been granted work permits. On March 26, 1974, Local 8 removed plaintiff from the hiring list at the direction of IUEC because of his lack of citizenship, and Local 8 refused to reinstate plaintiff. As a result of his removal from the hiring list, plaintiff was unable to obtain work in the industry and therefore alleges lost income and emotional injury.

EINRTP was constituted in an agreement between NEII, IUEC, and the United States Office of Federal Contract Compliance. The industry participated in EINRTP at least in part because of pressure from the federal government to increase the percentage of minority employees in the industry. The purpose of EINRTP is to provide a comprehensive national recruitment and training program for qualified and qualifiable members of minority groups. EINRTP's role in the hiring process for non-minorities is unclear, but apparently all new employees and inexperienced employees must be processed through EINRTP in order to become eligible for employment in the industry.[2] EINRTP is

---

1. These specific allegations are contained not in plaintiff's second amended complaint but in one of plaintiff's briefs. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant NEII's Motion to Dismiss, at 5. None of plaintiff's complaints alleged that plaintiff sought admission into EINRTP and that he met all the eligibility requirements except citizenship. Nevertheless, the Court will consider these facts rather than dismiss with leave to amend, because this lawsuit has al-

ready been delayed enough and because defendants themselves have proceeded on the assumption that the second amended complaint contained these allegations.

2. According to the initial complaint, all new applicants for employment in the industry and all inexperienced employees have to take a test administered by EINRTP, and performance on that test determines rank on the union hiring list. This allegation is not included in either amended complaint, but the second amended

funded by the Manpower Administration of the United States Department of Labor, and the Office of Federal Contract Compliance monitors the performance of EINRTP.

The federal government itself did not make citizenship an eligibility requirement for EINRTP. NEII and IUEC decided to make citizenship a requirement not only for admission into EINRTP but also for membership in the union.

## I. PROCEDURAL MOTIONS

### A. *Service of Process on NEII*

■ NEII's Rule 12(b)(5) motion to dismiss for insufficiency of service of process is denied on the ground of mootness, because plaintiff properly served NEII with the second amended complaint on June 29, 1977.

### B. *Lack of Prosecution*

■ Defendant NEII's motion to dismiss for lack of prosecution is also denied. Dismissal with prejudice for lack of prosecution is a severe sanction appropriate only in extreme circumstances where a plaintiff's conduct approaches contumacious and willfully dilatory. *Boazman v. Economics Laboratory, Inc.,* 537 F.2d 210, 212 (5 Cir. 1976); *Asociacion de Empleados del Instituto de Cultura Puertoriquena v. Rodriguez Morales,* 538 F.2d 915, 917 (1 Cir. 1976). While plaintiff's attorney could have handled this case much more expeditiously and methodically, dismissal with prejudice is unwarranted under the circumstances here where the neglect was moderate and in the absence of a showing of specific prejudice from the delay. *See Messenger v. United States,* 231 F.2d 328, 331 (2 Cir. 1956) (prejudice to defendant relevant although "operative condition of [Rule 41(b)] is lack of due diligence on the part of the plaintiff"). Dismissal without prejudice is also inappro-

priate, because it may have the same effect as dismissal with prejudice due to the probable bar of the applicable statute of limitations if the action is dismissed. *See Boazman v. Economics Laboratory, Inc., supra,* 537 F.2d at 212–213; *Griffin v. Pacific Maritime Ass'n.,* 478 F.2d 1118, 1119 (9 Cir. 1973) (three or four-year statute of limitations for § 1981 actions in California); *cf. Smith v. Cremins,* 308 F.2d 187 (9 Cir. 1962) (three-year statute of limitations for § 1983 actions).

### C. *Amendment to Include Class Allegations*

■ Defendant NEII's motion to strike plaintiff's class allegations because plaintiff did not obtain leave of court to include them in his first and second amended complaints is denied. Generally, amendments of complaints before the defendant has filed a responsive pleading are permitted as a matter of course without leave of court under Rule 15(a) of the Federal Rules of Civil Procedure. Since defendants have filed only a motion to dismiss, which is not a responsive pleading within the meaning of Rule 15(a), *Nolen v. Fitzharris,* 450 F.2d 958 (9 Cir. 1971) (per curiam); 6 Wright & Miller, Federal Practice and Procedure §§ 1475 and 1483 (1969), adding class allegations would not require leave of the Court. However, Rule 21 requires leave of court if parties are added "at any stage of the action." Putative classes are parties within the meaning of Rule 21. "Absent class members are parties to an action, properly before the court, and subject to its judicial orders." *McCubbrey v. Boise Cascade Home & Land Corp.,* 71 F.R.D. 62, 72 (N.D. Cal.1976). Whether Rule 15 or Rule 21 takes precedence when a party adds parties before a responsive pleading is served is the subject of a growing controversy. *See, e.*

---

complaint implies that EINRTP is involved in the hiring of all new and inexperienced employees, non-minority as well as minority, citizens as well as non-citizens.

This matter should be clarified by the parties. If eligibility for work permits and placement on the hiring list is independent of eligibility for EINRTP for some types of employees, defend-

ants' decision with respect to those employees does not appear to constitute federal action. Federal regulation and funding of EINRTP cannot by itself turn all of defendants' activities into federal action, and activities unrelated to EINRTP may not be attributable to the federal government.

*g., McLellan v. Mississippi Power & Light Co.,* 526 F.2d 870, 872–873 & n. 3 (5 Cir. 1976) (leave not required), *other parts vacated,* 545 F.2d 919, 922 n. 3 (5 Cir. 1977) (*en banc*), and authorities cited therein; 6 Wright & Miller, Federal Practice and Procedure § 1479, at 400–402 & nn. 55 & 58 (1969 and 1977 Supp.). The Court concludes that Rule 15 prevails and that plaintiff may add the class allegation without leave of court. Although turning an individual action into a class action fundamentally affects the character of the lawsuit, the addition of new parties does not as a general rule affect the interests of parties already in the lawsuit significantly more than the addition of new claims. Plaintiffs have complete freedom to name parties when they commence an action, and the interests of defendants will not be substantially prejudiced in the early stage of a lawsuit by any delay in adding parties. Indeed, courts would grant motions to add parties at the early stages of litigation almost as a matter of course since the liberal standard of Rule 15 also applies to Rule 21 motions. *See Fair Housing Development Fund Corp. v. Burke,* 55 F.R.D. 414, 419 (E.D.N.Y.1972). Consequently, involving the court in these matters serves no useful purpose and simply imposes an unnecessary burden on courts and litigants alike.

## II. PRE–EMPTION BY NLRA

Before reaching the merits of this lawsuit, the Court must resolve a threshold jurisdictional question. Defendant IUEC contends that the Court's jurisdiction over plaintiff's constitutional and statutory claims is pre-empted by § 10(a) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(a), which gives the National Labor Relations Board (NLRB) exclusive jurisdiction over claims involving conduct arguably protected or prohibited by §§ 7 and 8 of the NLRA, 29 U.S.C. §§ 157–158.

Defendants' conduct is arguably prohibited by the NLRA. The NLRA imposes a duty of fair representation on unions that benefit from its protection, and that duty requires unions not to discriminate among members of bargaining units on the basis of arbitrary or discriminatory criteria. *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). One arbitrary and irrational criteria is alienage, *NLRB v. Int'l. Longshoremen's Ass'n., Local No. 1581,* 489 F.2d 635, 637–638 (5 Cir.), *cert. denied,* 419 U.S. 1040, 95 S.Ct. 419, 42 L.Ed.2d 316 (1974), so IUEC's exclusion of plaintiff on the basis of his alienage arguably constitutes a breach of IUEC's duty of fair representation. A breach of that duty is an unfair labor practice on the part of both IUEC under § 8(b)(2) and of NEII under § 8(a)(3). *Kling v. NLRB,* 503 F.2d 1044, 1046 (9 Cir. 1975); *Barton Brands, Ltd. v. NLRB,* 529 F.2d 793, 799 (7 Cir. 1976); *NLRB v. Int'l. Longshoremen's Ass'n., Local No. 1581, supra,* 489 F.2d at 637–638.[3]

Since IUEC contends that even if plaintiff has a cause of action under § 1981 and the Fifth Amendment, his remedy is pre-empted by the NLRB, the Court will assume in its consideration of the pre-emption issue that plaintiff does have a remedy under § 1981 and the Fifth Amendment. The question before the Court therefore is whether plaintiff's remedy under § 10 of the NLRA is exclusive and replaces his judicial remedy under § 1981 and the Fifth Amendment.[4]

---

**3.** Section 8(b)(2) of the NLRA makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection [8](a)(3) * * *." Subsection 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

Although the cases cited in the text all involve § 8(b)(2) charges against the union, they clearly stand for the proposition that the employer commits an unfair labor practice as well, at least where as here the union was successful in causing it to discriminate against aliens, since a § 8(b)(2) violation occurs when a union induces or attempts to induce an employer to violate § 8(a)(3).

**4.** Because two federal laws are involved here, the only branch of the pre-emption doctrine at

 The standard for determining whether one statute implicitly repeals another is set out in *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936):

> "The cardinal rule is that repeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both if possible. There are two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest * * *."

The second category is not applicable because the NLRA does not provide a broad remedy for the deprivation of individual civil rights like § 1981 and was not "clearly intended as a substitute" for § 1981 and the Fifth Amendment. *See Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (remedies under Title VII pre-empt remedies under § 1981 for discrimination against federal governmental employees); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460–461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (concurrent remedies under Title VII and § 1981 for other classes of employees covered by Title VII). In order to fit into the first category, the two statutes must be in "irreconcilable conflict," but the NLRA, § 1981, and the Fifth Amendment are reconcilable.

 Concurrent jurisdiction of the district courts and the NLRB does not substantially interfere with the purposes of § 10(a) of the NLRA. The NLRB generally has exclusive jurisdiction over claims arguably involving unfair labor practices because the NLRB has special expertise in accommodating the conflicting interests of labor and management. Moreover, the need for uniform interpretation and application of federal labor law requires that one tribunal hear claims arising under it. *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 286–291, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Vaca v. Sipes,* 386 U.S. 171, 178–179 (1967). There are many exceptions to this general rule, and one exception covers cases involving alleged breaches of the duty of fair representation. In *Vaca v. Sipes, supra,* 386 U.S. at 180–184, 87 S.Ct. 903, the Supreme Court held that state remedies for breaches of the duty of fair representation were not pre-empted by the federal labor law for a variety of reasons, including the inability of the Board to provide a full remedy and judicial expertise in the development and application of the doctrine of the duty of fair representation.[5] Although *Vaca* is not controlling authority for the reconciliation of two federal statutes, it does establish that concurrent jurisdiction would not frustrate the policies underlying the pre-emption doctrine.

---

issue concerns the primary jurisdiction of the NLRB, and no question about the invalidity of a state law under the Supremacy Clause can be raised. *Cf. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383 n. 19, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

**5.** Judicial expertise is even greater in the area of employment discrimination than in the processing of grievances, the source of the dispute in *Vaca.* Courts regularly adjudicate cases involving employment discrimination prohibited by the various federal civil rights laws, and as a result, courts are at least as expert as the NLRB in deciding these cases. The pre-emption doctrine should not be applied "where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is

safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes." *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 297–298, 91 S.Ct. 1909, 1923, 29 L.Ed.2d 473 (1971) (footnote and citation omitted).

Furthermore, the NLRB's expertise is most useful in cases involving balancing the conflicting interests of labor, management, and the public in industrial peace and collective bargaining. *See Motor Coach Employees v. Lockridge, supra,* 403 U.S. at 286, 91 S.Ct. 1909. Such balancing is inappropriate in fair representation cases, because Congress decided that arbitrary discrimination against a class of employees, even if it promotes collective bargaining and labor peace, is impermissible.

That conclusion is reinforced by the explicit application of Title VII of the Civil Rights Act of 1964 to practices of labor organizations and of apprenticeship and training programs operated by labor and management. 42 U.S.C. § 2000e–2(c–d). Congress concluded that courts could participate in the enforcement of Title VII without undermining the enforcement of the federal labor laws. *Emporium Capwell Co. v. Western Addition Community Org.,* 420 U.S. 50, 70–73 & n. 25, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (employer conduct unregulated by NLRA may be prohibited under Title VII); *Local Union No. 12, Plastic Workers of America v. NLRB,* 368 F.2d 12, 24 (5 Cir. 1966) (concurrent remedies under NLRB and Title VII) (dictum). Although that conclusion does not dispose of the precise issue before the Court, it does provide an additional and persuasive reason why concurrent jurisdiction of the NLRB and district courts in civil rights cases is not only tolerable but even desirable.

In contrast to the minimal effect on federal labor policy, pre-emption of district court jurisdiction in civil rights cases would cause a substantial impairment of the congressional purposes in enacting § 1981. If district courts do not have jurisdiction over § 1981 claims involving unionized industries, present and prospective workers in those industries are in effect deprived of the protection of § 1981. The NLRB has no authority to enforce § 1981, and if neither the NLRB nor the district courts can enforce that provision, it is unenforceable. Section 1981 applies by its terms to contracts in unionized industries, and withdrawal of the protection of § 1981 from the substantial number of workers employed in those industries would significantly limit the reach of § 1981.

A member of the bargaining unit allegedly injured by a breach of the duty of fair representation has some remedies available through the Board, but the remedies available under § 10(c) of the NLRA are more limited than those available under § 1981. The victim of an unfair labor practice can recover neither damages for emotional distress nor punitive damages. *Linn v. Plant Guard Workers,* 383 U.S. 53, 63, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (damages for libel); *UAW v. Russell,* 356 U.S. 634, 646, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (punitive damages). Congress' decision to make both those types of damages available under § 1981, *Johnson v. Railway Express Agency,* 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (dictum); *Tramble v. Converters Ink Co.,* 343 F.Supp. 1350, 1354–1355 (N.D.Ill.1972); *Parker v. Shonfeld,* 409 F.Supp. 876, 879 & n. 4 (N.D.Cal.1976) (§ 1982), indicates that both are necessary to compensate fully individuals whose civil rights have been violated and to deter future violations of § 1981. Eliminating those remedies by eliminating district court jurisdiction over some § 1981 claims would undercut the legislative purpose behind § 1981.

In its pre-emption argument, IUEC does not focus on plaintiff's Fifth Amendment claim as distinguished from his § 1981 claim. The Fifth Amendment claim, discussed in Part III, is predicated on the contention that defendants' decision to bar plaintiff from admission to EINRTP constitutes federal action because the nexus between the federal involvement and defendants' conduct is so close. If it is so close that "the nominal private employer [lacks] enough control over the subjects of concern to labor unions that it could [not] bargain effectively with a union," the NLRB has no jurisdiction, and no jurisdiction to pre-empt that of a federal court, because defendants fall within the federal government exemption of the NLRA. *Compton v. National Maritime Union,* 533 F.2d 1270, 1275 (1 Cir. 1976); *Herbert Harvey, Inc. v. NLRB,* 137 U.S.App.D.C. 282, 424 F.2d 770 (1969). The Court expresses no opinion on that issue, because the NLRB has jurisdiction to determine its jurisdiction, subject of course to review by the Courts of Appeals. *Cf. Herbert Harvey, Inc. v. NLRB,* 128 U.S.App. D.C. 162, 385 F.2d 684 (1967). Assuming that the NLRB does have jurisdiction even if defendants' conduct constitutes federal action (and federal action for the purposes

of federal labor policy may be different from federal action for the purposes of federal constitutional policy), the Court does not understand defendants to argue that the NLRA pre-empts federal court jurisdiction under Article III over constitutional claims. Whether or not this withdrawal of jurisdiction from an inferior federal court would be constitutional, there is no basis to conclude that Congress intended to withdraw that jurisdiction, for concurrent judicial enforcement of constitutional provisions undermines the policies behind pre-emption no more than concurrent judicial enforcement of federal statutory civil rights claims. *But see Buckley v. American Federation of Television and Radio Artists,* 496 F.2d 305, 312–313 (2 Cir.), *cert. denied,* 419 U.S. 1093, 95 S.Ct. 688, 42 L.Ed.2d 687 (1974) (district court jurisdiction to hear union member's federal constitutional claim pre-empted by NLRB jurisdiction).

▆ For these reasons, the Court has jurisdiction over plaintiff's § 1981 and Fifth Amendment claims, concurrent with the NLRB's jurisdiction over plaintiff's potential unfair labor practice charges. *Guerra v. Manchester Terminal Corp.,* 498 F.2d 641, 651 & n. 20 (5 Cir. 1974).

## III. FEDERAL ACTION IN EINRTP

Plaintiff contends that the federal government's involvement in EINRTP, the industry's affirmative action program, is substantial enough to require a finding of federal action and that the citizenship requirement for admission into EINRTP and into the union constitutes discrimination by a federal governmental entity on the basis of alienage which violates both the Fifth Amendment and 42 U.S.C. § 1981.

▆ It is settled that federal involvement in nominally private conduct can in certain circumstances make that private conduct subject to constitutional limitations on the federal government. *Public Utilities Commission v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (District of Columbia); *Mathis v. Opportunities Industrialization Centers, Inc.,* 545 F.2d 97 (9 Cir. 1976) (per curiam); *Ginn v. Mathews,* 533 F.2d 477, 480 & n. 4 (9 Cir. 1976) (both federal and state involvement); *Northrip v. Fed. Nat'l. Mortgage Ass'n.,* 527 F.2d 23, 30–33 (6 Cir. 1975); *Roberts v. Cameron-Brown Co.,* 410 F.Supp. 988, 995 (S.D.Ga.1975).[6] In those cases, the courts considered the same

**6.** These courts have implicitly assumed, without addressing the issue, that the standard for governmental action is the same whether state action or federal action is involved. It is arguable that the nexus between the private entity and the government must be closer in federal action cases.

The states' broad regulatory authority under their police power, as distinguished from the more limited authority of the federal government (reflected, for example, in the Tenth Amendment) may create a greater danger that states will indirectly circumvent federal constitutional limitations and a greater need for protection against evasion of constitutional safeguards. The application of constitutional limitations only to governmental conduct rests on the recognition that unchecked governmental power threatens individual rights and liberties in a manner qualitatively different from unchecked private power. Concentrations of private power posing the same threat to individual rights and liberties that governmental power poses may more often be found in close relationship with states than with the federal government. *Cf.* Wellington, The Constitution, the Labor Union, and "Governmental Action," 70 Yale L.J. 345, 346–348 (1961) (theories of constitutional doctrine of governmental action).

In addition, it could be argued that federal authority is more resistant than state authority to manipulation by those concentrations of private power because of the federal government's greater size.

On the other hand, the demand during the ratification of the Constitution for the adoption of a Bill of Rights applicable to the federal government represents a long-standing recognition of a special need to check the powers of a large centralized government more distant from the people and more immune from their pressures. The increasing role of the federal government in the last quarter of this nation's history suggests that the danger of indirect federal evasion of constitutional safeguards approaches, if it does not yet exceed, the corresponding danger from the states.

It is possible to construct a statutory argument that the Fourteenth Amendment binds private entities to a greater degree than the Fifth Amendment does. Section 1983 of Title 42 of the United States Code, the basis for most suits involving state action, covers action not only by state officials but by every person acting under color of state law. *Cf.* 28 U.S.C. § 1331(a) (waiver of $10,000 amount-in-controversy requirement for suits under Constitution

factors in connection with federal action that are applied in state action cases. The relevant factors include (1) the existence of a symbiotic relationship between the government and the private entity, *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357–358, 95 S.Ct. 449, 42 L.Ed.2d 447 (1974); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722–726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); (2) the degree of government regulation of the private entity, *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 350–351, 95 S.Ct. 449; *Public Utilities Comm'n. v. Pollak,* 343 U.S. 451, 462, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); (3) governmental sanction of the challenged activity, either in fact, *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 354–357, 95 S.Ct. 449; *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176–177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Reitman v. Mulkey,* 387 U.S. 369, 380–381, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Public Utilities Comm'n. v. Pollak, supra,* 343 U.S. at 462, 72 S.Ct. 813 (1952); or in appearance, *Coleman v. Wagner College,* 429 F.2d 1120, 1126–1127 (2 Cir. 1970) (Friendly, J., concurring); (4) the degree of monopoly power of the private entity and its relationship to the challenged action, *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 351–352, 95 S.Ct. 449; and (5) the governmental nature of the function performed by the private entity, *Marsh v. Alabama,* 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 352–354, 95 S.Ct. 449. Each of these criteria is vague,

and none is determinative of the federal action issue. Although interrelated, the criteria often point in different directions. The only certainty is that "the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits no easy answer." *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 349–350, 95 S.Ct. at 453.

■ On first impression, the conclusion that there is a symbiotic relationship between defendants and the federal government may seem almost irresistible. First, the federal government funded all or part of the affirmative action program to which plaintiff was denied admission. Second, the federal government closely regulated EINRTP from its inception. These two factors alone seem to put defendants and the government in a "position of interdependence" which makes defendants "joint participant[s] in the enterprise." *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 357–358, 95 S.Ct. 449. Third, one of the private entities, IUEC, has a peculiar kind of federally facilitated monopoly as the exclusive bargaining representative of workers in the industry, and that federal involvement has some elements of federal action. *See Railway Employes' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *Int'l. Ass'n. of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (union shop as arguable federal action); *cf. Abood v. Detroit Board of Education,* 431 U.S. 209, 219,

only when the defendant is an officer or employee of United States acting "in his official capacity").

The significance of the language of § 1983 is uncertain. First, it is unclear whether Congress chose the "under color of law" language in order that federal courts should make constitutional restraints applicable where they otherwise would not be, and Congress did not intend in § 1983 to secure a federal statutory right broader than any federal constitutional right. Second, even if Congress gave federal courts a license to police nominally private activities closely associated with the states, federal courts should not necessarily limit their scrutiny of nominally private activities closely associated with the federal government. Congress cannot be depended on to enact legislation lim-

iting the power of *de facto* agents of the federal government. The Bill of Rights was adopted because the federal government could not be relied on to restrain itself, and to give much weight to Congress' failure to prohibit people acting under color of federal law from violating the constitutional rights of others would undercut the federal courts' responsibility to keep the other branches of the federal government within the broad limits set by the Constitution. The scope of Fifth Amendment protection cannot depend on the language of a federal statute.

The Court does not decide this difficult question at this stage of the litigation. It does point it out to the parties and alert them that they may need to address themselves to it in future stages.

226, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Fourth, the pervasiveness of the federal involvement could create the appearance to outsiders that the federal government was implicated in the decision to exclude aliens even if the government had no direct part in that decision. Finally, the industry agreed to participate in the program only after the federal government applied some pressure, although it was compulsion short of a court order or a threat by the federal government to terminate immediately all federal government contracts with the industry.[7]

As often happens in government action cases, a number of other factors point to the opposite conclusion. As plaintiff concedes, defendants imposed the citizenship requirement for admission to EINRTP at their own initiative independently of the federal government. Plaintiff does not allege that the federal government in any way encouraged, approved, or condoned the decision to exclude aliens. The Supreme Court has held that "where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' *Reitman v. Mulkey,* 387 U.S. 369, 380 [87 S.Ct. 1627, 18 L.Ed.2d 830] (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition." *Moose Lodge No. 107 v. Irvis, supra,* 407 U.S. at 173, 92 S.Ct. at 1971. The Supreme Court made the question of the impetus critical in *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 357, 95 S.Ct. 449 (footnote omitted); the "exercise of the choice allowed by state law where the initiative comes from [the private party] and not from the State, does not make its action in doing so 'state action' for the purposes of the Fourteenth Amendment." The test for federal action under the Fifth Amendment is no less strict.[8] As Judge Friendly phrased the requirement in *Powe v. Miles,* 407 F.2d 73, 81 (2 Cir. 1968), "the essential point [is] that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury."[9] Here there is no claim that the federal government was involved in the decision to exclude aliens, the decision that caused the injury of which plaintiff complains.

■ The federal government maintained a neutral policy of noninterference with the industry's policy on the employment of aliens. Plaintiff does not allege that aliens were proportionately overrepresented among applicants to EINRTP or to the union generally, so the decision to exclude aliens did not affect any interest that the federal government had in the operation of the affirmative action program. There would seem to be no better basis for imposing an affirmative duty on the government to ban private discrimination against aliens than there is for imposing an analogous constitutional duty on the government to ban private racial discrimination,[10] and a finding of federal action in this case could in effect impose such an affirmative constitutional duty. Furthermore, the federal government has never adopted a policy of interfering with private

---

7. Although alienage, like race, is a suspect classification for purposes of Fourteenth Amendment analysis, *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the level of scrutiny of federal classifications based on alienage is less strict. *See Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). Therefore, even if courts should use a looser standard for governmental action where racial discrimination is involved, *Northrip v. Fed. Nat'l. Mortgage Ass'n.,* 527 F.2d 23, 33 (6 Cir. 1975); *Coleman v. Wagner College,* 429 F.2d 1120, 1127 & n. 3 (2 Cir. 1970) (Friendly, J., concurring), the same is not necessarily true where alienage discrimination by a federal entity is involved.

8. See n. 6, *supra.*

9. The Court of Appeals for the Ninth Circuit approved Judge Friendly's statement in *Martin v. Pacific Northwest Bell Telephone Co.,* 441 F.2d 1116, 1118 (9 Cir. 1971), and again in *Chrisman v. Sisters of St. Joseph of Peace,* 506 F.2d 308, 313 (1974).

10. *See Reitman v. Mulkey,* 384 U.S. 369, 374–375, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (no affirmative state duty to ban private racial discrimination).

**1134**

decisions not to hire aliens except in limited cases where a strong federal interest was at stake,[11] and the Court therefore cannot infer "a pattern of intentional indirect circumvention of constitutional rights" like that evidenced in racial discrimination cases. *Adams v. Southern California First National Bank,* 492 F.2d 324, 333 (9 Cir. 1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974). The failure of the federal government to intervene in a traditionally unregulated area creates no inference of tacit approval of discrimination. *Cf. Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (state constitutional authorization of private housing discrimination that repealed state fair housing laws held unconstitutional).

▆ The Court must also consider the practical effects of a finding of federal action in this case. *Cf. Northrip v. Fed. Nat'l. Mortgage Ass'n., supra,* 527 F.2d at 33 (finding of federal action improper in part because result would increase costs to consumer). If private employers risked being bound by the myriad constitutional and statutory constraints which apply to governmental action, state as well as federal, when they agreed to participate in an affirmative action program funded by the federal government, they would be significantly less willing to participate voluntarily. Private employers and unions could avoid the possibility of such constraints if they financed the affirmative action program themselves, but this might deter voluntary adoption of such programs. The risk of jeopardizing voluntary affirmative action programs by finding federal action in this case is a factor which the Court cannot ignore.

▆ As noted above, plaintiff makes a strong case that defendants and the federal government had a "symbiotic relationship" for Fifth Amendment purposes. Where the government and the private enterprise are in such a relationship, the challenged action may constitute federal action even though the government did not directly participate in it. *See, e. g., Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, direct governmental sanction is relevant even in the context of a symbiotic relationship, *see Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 358, 95 S.Ct. 449, and the less direct the governmental involvement in the challenged activity, the more symbiotic the relationship must be to turn private action into federal action. Here the federal government is not directly implicated in the decision to make citizenship a requirement for admission to EINRTP, and as a result the federal action question is a close one.

▆ In these circumstances, the Court cannot dismiss plaintiff's Fifth Amendment claim on the pleadings. Were this a motion for summary judgment or a motion to dismiss after plaintiff presented his evidence under Rule 41(b) of the Federal Rules of Civil Procedure, and plaintiff had offered no more in support of his federal action claim than is contained in his second amended complaint, the Court might come to a different conclusion. But in a Rule 12(b)(6) motion, the Court should not dismiss an action unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). Governmental action is so fact-specific that the Court must know more details about the federal involvement in EINRPT before it can conclude that defendants' conduct is or is not attributable to the federal government for purposes of the Fifth Amendment. Relevant details include, among others, the nature of any discussion between defendants and federal officials about the citizenship requirement, the degree of federal funding, the terms of the agreement about EINRTP between the Office of Federal Contract Compliance and defendants, the statutory authority of the federal agencies involved

11. *See, e. g.,* 10 U.S.C. § 2279 (employees of aircraft defense contractors), 12 U.S.C. § 72 (directors of national banking associations and state bank or trust companies which are members of Federal Reserve System).

in EINRTP to require or prohibit admission of aliens to the program, and the type and strength of the pressure exerted on the industry to participate in an affirmative action program.

This issue should be resolvable through a motion for summary judgment, and the parties should investigate that possibility.

 If indeed defendants' action in excluding plaintiff from EINRTP because he is an alien constituted federal action, plaintiff has stated a claim under the Fifth Amendment. In *Graham v. Richardson,* 403 U.S. 365, 371–372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Supreme Court held that a state which discriminates against aliens must justify that discrimination by a compelling state interest because alienage is a suspect classification under the Equal Protection Clause of the Fourteenth Amendment. Although "the paramount federal power over immigration and naturalization forecloses a simple extension of the holding" in *Graham* to federal discrimination, *Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 1904, 48 L.Ed.2d 495 (1976), *on remand* 435 F.Supp. 37 (N.D.Cal. 1977), the Due Process Clause of the Fifth Amendment forbids the federal government from subjecting on an arbitrary basis aliens to different substantive rules than those applied to citizens. *Id.* at 101, 96 S.Ct. 1895.

If in fact defendants discriminated against plaintiff because of his noncitizenship and if in fact that discrimination constituted federal action, defendants must show that some legitimate interest of theirs was furthered by that discrimination. The Supreme Court in *Mow Sun Wong* refused to decide what level of scrutiny federal discrimination against aliens should be sub-

jected to, *id.* at 103, 96 S.Ct. 1895, and this Court sees no need to decide that difficult question at this stage of the litigation, *see Mow Sun Wong v. Hampton, supra,* 435 F.Supp. at 42–44. Indeed, the question may never arise because defendants may not have the institutional authority to make a decision to exclude aliens from EINRTP. In *Mow Sun Wong,* the Supreme Court held unconstitutional a federal Civil Service Commission rule barring aliens from employment in the civil service because neither Congress nor the President had authorized the rule and because the interests advanced by the Commission in support of the rule were not properly the concern of that agency. *Id.* at 116, 96 S.Ct. 1895. Even if some federal body could constitutionally bar aliens from EINRTP or from the elevator construction industry in general, defendants might not have that power. The Court intimates no opinion on the merits of that issue since defendants have not yet explained the reasons why exclusion of aliens from EINRTP is justifiable or why those reasons are related to the legitimate concerns of defendants.

 If plaintiff proves that defendants, acting in a governmental capacity, excluded him from EINRTP because he is an alien, the Court has the power to award him equitable relief.[12] *See, e. g., Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (settled power of federal courts to issue injunctions for constitutional violations). The source of a federal cause of action for damages is not so clear. Section 1981, as Part IV demonstrates, applies only to discrimination by states, and its legislative history gives no better basis for concluding that it prohibits federal discrimination against aliens than that it prohibits private discrimination against aliens.[13] Al-

12. Plaintiff has not specifically sought equitable relief, and it may not be necessary because citizenship is apparently no longer a prerequisite for membership at least of IUEC. Paragraph 12(a) of Second Amended Complaint.

13. The prohibition of § 1981 against racial discrimination by the federal government, *Bowers v. Campbell,* 505 F.2d 1155, 1157–1158 (9 Cir. 1974), does not mean that it also prohibits

alienage discrimination by the federal government. The ban on racial discrimination derived from the 1866 Act, which was based on the Thirteenth Amendment, and that Amendment reach racial discrimination regardless of its source. *Bowers v. Campbell,* supra, 505 F.2d at 1158; *District of Columbia v. Carter,* 409 U.S. 418, 421–423, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). The very different origins of the 1870 Act establish that it did not make alienage

ternatively, plaintiff could argue that he has an implied damage remedy under the Fifth Amendment. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Since the parties have not yet addressed themselves to this issue, the Court intimates no view whether the Fifth Amendment implicitly creates a damage remedy for federal discrimination against aliens. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (implied statutory rights of action). Nor does it decide whether that remedy would permit recovery of damages for emotional distress under the circumstances of this case.

## IV. § 1981 AND PRIVATE ALIENAGE DISCRIMINATION

■ As an alternative to his federal action theory, plaintiff contends that defendants' refusal to permit him employment in the elevator construction industry constitutes private discrimination on the basis of citizenship prohibited by 42 U.S.C. § 1981.[14] His allegations fail to state a claim upon which relief can be granted under § 1981.

The present § 1981 is derived from two statutes, § 1 of the Act of April 9, 1866, 14 Stat. 27 ("1866 Act") and § 16 of the Act of May 31, 1870, 16 Stat. 140 ("1870 Act").[15]

discrimination illegal regardless of its source, and of course the Fourteenth Amendment, which the 1870 Act was designed to enforce, applies only to state action and does not apply to the federal government.

14. Section 1981 provides:
 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

15. Section 1 of the 1866 Act and § 16 of the 1870 Act were consolidated in what is now 42 U.S.C. § 1981 in the recodification of the federal laws in 1874, but that recodification was not intended to make any substantive changes in either § 1 or § 16. *Runyon v. McCrary,* 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

The 1866 Act was enacted pursuant to Congress' power under § 2 of the Thirteenth Amendment to eliminate the badges and incidents of slavery, and it prohibits private discrimination on the basis of race. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). Section 1 of the 1866 Act was by its terms limited to "citizens,"[16] and plaintiff does not claim that he is protected by the 1866 Act.

If § 1981 prohibits private discrimination against aliens in the making of contracts, it is because of the 1870 Act. Section 16 of that Act provides as follows:

 "That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a

16. Section 1 provided:
 "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime where the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void."

The legislative history of § 16 establishes that it prohibited discrimination against aliens where states engaged in the discriminatory conduct [17] but that the prohibition of alienage discrimination did not extend to conduct of private individuals.

The provision that became § 16 of the 1870 Act originated as part of S.365. Senator Stewart of Nevada introduced S.365, a "bill to secure to all persons the equal protection of the laws," on January 10, 1870. Cong.Globe, 41st Cong., 2d Sess. 323 (1870). That bill provided:

"*Be it enacted, &c,* That all persons within the jurisdiction of the United States, Indians not taxed excepted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating thereto from a foreign country which is not equally imposed and enforced upon every person emigrating to such State from any other foreign country, and any

law of any State in conflict with this provision is hereby declared null and void.

"*Sec. 2. And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

"*Sec. 3. And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted, and said act, except the first and second sections thereof, is hereby referred to and made a part of this act."

S.365 was reported with an amendment from the Committee on the Judiciary on February 2, 1870.[18] *Id.* at 964.

On February 24, 1870, Senator Stewart described the relationship of the S.365 to the 1866 Act:

"The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens * * *. It extends the operation of the civil rights bill * * to all persons within the jurisdiction of the United States." *Id.* at 1536.

---

**17.** Defendants rely on dicta in a number of cases that § 1981 applies to racial discrimination only. *See, e. g., Arnold v. Tiffany,* 359 F.Supp. 1034, 1035 (C.D.Cal.), *aff'd on other grounds,* 487 F.2d 216 (9 Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974) (discrimination against independent newsdealers). The Court cannot accept that interpretation because it would make meaningless the Congressional decision to extend the protection of § 16 of the 1870 Act to "all persons within the jurisdiction of the United States" rather than simply to "any citizen," as was done in § 1 of the 1866 Act, and would

contradict the legislative history of the 1870 Act. The issue is not whether § 1981 protects aliens but the extent of that protection—against state discrimination only or against all discrimination, private as well as governmental.

**18.** The Committee on the Judiciary struck the last part of the second sentence of § 1, beginning with the phrase "from a foreign country" after the word "thereto." Id. at 1536. This was the form of the bill when it was offered as an amendment to S.810. See p. 1138, *infra.*

Senator Stewart's statement that S.365 "extends the operation of the civil rights bill * * * to all persons within the jurisdiction of the United States" could, taken alone, suggest that the bill was intended to reach private discrimination since the 1866 Act reaches private discrimination. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Senator Stewart's immediately prior statement negates that inference. Senator Stewart's understanding of the operation of the "original civil rights bill" was that it "protected all persons born in the United States *in the equal protection of the laws*" (emphasis supplied), so for Senator Stewart, a bill that extended its operation to aliens did not necessarily reach private discrimination.[19] Senator Stewart's limited conception of S.365 was illustrated in the same debate by his statement that his bill "simply extends to foreigners, not citizens, the protection of our laws *where the State laws deny* them the equal civil rights enumerated in the first section" of S.365. *Id.* at 1536 (emphasis added). These statements demonstrate that the sponsor of the bill thought that it prohibited discrimination against aliens only where state discriminatory action was involved, and the statements of the sponsor of legislation are entitled to great weight. *Nat'l. Woodwork Mfrs. Ass'n. v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

Later in that session of Congress on April 19, Senator Edmunds introduced S.810, a bill to enforce the Fifteenth Amendment. *Id.* at 2803. On May 16, 1870, Senator Stewart offered S.365 as an amendment to S.810. *Id.* at 3480. The amendments provided as follows:

"*And be it further enacted,* That all persons within the jurisdiction of the United States, (Indians not taxed excepted,) shall have the same right in very State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating thereto.

"Sec. 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties, on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and on conviction shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.

"Sec. 3. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted; and said act, except the first and second sections thereof, is hereby referred to and made a part of this act; and section fifteen and section sixteen thereof shall be enforced according to the provisions of said act."

After the House passed H.R.1293, also a bill to enforce the Fifteenth Amendment, the Senate turned its attention to that bill. As passed by the House, H.R.1293 contained

---

**19.** That Senator Stewart simply misunderstood the scope of the 1866 Act is entirely possible, for the intent of Congress in that Act is sufficiently ambiguous that four of the present justices of the Supreme Court share Senator Stewart's misconception. *See Runyon v. McCrary,* 427 U.S. 160, 186, 96 S.Ct. 2586, 49 L.Ed.2d 415 (Powell, J., concurring), 189 (Stevens, J., concurring), 192 (White and Rehnquist, JJ., dissenting).

no provisions analogous to S.365. On May 18, Senator Stewart offered S.810, together with his amendments, as a complete substitute for H.R.1293, *id.* at 3561, and subsequent Senate debates concerned that version of the bill.[20]

The Senate debates focused almost exclusively on the provisions for the protection of voting rights of blacks, and Senator Stewart's amendments were largely overlooked. On May 20, however, Senator Stewart spoke at some length about those equal protection provisions:

"While [Chinese aliens] are here I say it is our duty to protect them. * * * It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see that they have the equal protection of the laws, notwithstanding that they are aliens. * * * If the State courts do not give them the equal protection of the law, if public sentiment is so inhuman as to rob them of their ordinary civil rights, I say I would be less than man [*sic*] if I did not insist * * * that we will protect Chinese aliens or any other aliens whom we allow to come here, and give them a hearing in our courts; let them sue and be sued; let them be protected by all the laws and the same laws that other men are. That is all there is in that provision.

" * * * The fourteenth amendment to the constitution says that no State shall deny to any person the equal protection of the laws. Your treaty says that they shall have the equal protection of the laws. Justice and humanity and common decency require it." *Id.* at 3658.

The Senator's choice both of language and of examples of discrimination against aliens which his bill was intended to prohibit indicates that the purpose of the amendments was to prohibit alienage discrimination by the states. There is no indication that these amendments were aimed at private discrimination, and indeed, Senator Stewart stated that the prohibition against discriminatory state laws and practices "is all there is in that provision."

On May 21, the Senate passed H.R.1293 as amended by the equal protection provisions. *Id.* at 3690. A conference was held to reconcile the differences between the Senate and House bills, and the conference report recommended the adoption of the equal protection provisions without substantive change. *Id.* at 3752.[21]

The first and only House debate on the equal protection provisions occurred during the debate of the conference report on May 27. Representative Bingham, the sponsor of H.R.1293, a House conferee, and the floor manager of the conference report,[22] discussed what he called a "provision regulating the imposition of taxes upon immigrants by the legislation of the respective states." He characterized the substance of the provision as "that immigrants being persons within the express words of the fourteenth article of the constitutional amendments, shall * * * be entitled to the equal protection of the laws, not simply of the State itself, but of the Constitution of the United States as well." *Id.* at 3871. These remarks demonstrate at least Repre-

**20.** Senator Stewart's equal protection amendments became §§ 15–17 of the substitute. Section 15 incorporated two minor changes from § 1 of the amendments he initially offered to S.810. The exception for Indians not taxed was eliminated, and the last sentence was amended to read, "No tax or charge shall be imposed or enforced by any State upon any person emigrating to such State from any other foreign country, and any law of any State in conflict with this provision is hereby declared null and void."

**21.** The only changes involved replacing references to emigrants with references to immigrants.

**22.** The statements of the sponsor of legislation are entitled to great weight. *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); *Nat'l. Woodwork Mfrs. Ass'n. v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). When the statements of the draftsman and floor manager go unchallenged, one must infer "that the House accepted these authoritative representations as to the proper construction of the bill." *United States v. UMW,* 330 U.S. 258, 279–280, 67 S.Ct. 677, 689, 91 L.Ed. 884 (1947) (footnote omitted).

sentative Bingham's understanding, which is "authoritative" absent evidence to the contrary, *see* n. 22, *supra,* that those provisions applied to state action, and they contain no hint that they applied to private action. Nor is there any such hint in the remainder of the House debate on these provisions, debate which dealt primarily with whether the provisions should be part of a bill to protect voting rights and with the racial characteristics of the Chinese. The House approved the conference report. *Id.* at 3884.

The Senate approved the conference report on May 25. *Id.* at 3809. During the debate about the report, the subject of the equal protection provisions came up. Senator Stewart, speaking now as one of three Senate conferees, stressed that Congress could not allow "a State in this Union to pass barbarous and cruel laws, to place upon [Chinese immigrants] unjust and cruel burdens, to tax them differently from other people, and collect that tax in a brutal manner." *Id.* at 3807. The Senator then cited various discriminatory measures pending in the California legislature. In tracing the legislative history of the equal protection provisions, the Senator quoted at length from his remarks on May 20.[23] Senator Stewart then attacked a Senator from California who criticized the equal protection provisions:

> "Dare he say to the good people of California that while the Chinese are here under our laws, and while we have a Constitution which says that no State shall deny to any person within its jurisdiction the equal protection of the laws, Congress ought not to pass a law to give them protection?" *Id.* at 3808.

These statements of the sponsor of the legislation clearly establish that it was intend-

ed to prohibit only discriminatory legislation of the states.

 The legislative history of the 1870 Act therefore demonstrates that it was not aimed at private discrimination against aliens. Congress' exclusive concern was with state laws that denied equal protection to aliens. The recurrent references throughout the Senate and House debates to provisions to enforce the Fourteenth Amendment,[24] which by its terms applies only to state action, suggest that these provisions were directed at state action. The constitutional source of a statute is one guide to its interpretation because "it has long been recognized that '[d]ifferent problems of statutory meaning are presented by two enactments deriving from different constitutional sources. * * * ' *Monroe v. Pape* [365 U.S. 167, 205–206, 81 S.Ct. 473, 5 L.Ed.2d 492] (separate opinion of Frankfurter, J.)." *District of Columbia v. Carter,* 409 U.S. 418, 423, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973). Congress passed the 1870 Act for the protection of aliens under its power to enforce the Fourteenth Amendment, *see Tillman v. Wheaton-Haven Recreation Ass'n.,* 410 U.S. 431, 439 n. 11, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973) ("the 1870 Act was passed pursuant to the Fourteenth [Amendment]") (dictum), and that fact implies that Congress intended to reach only state action.

It could be argued, in a paraphrase of the Supreme Court's analysis of § 1982 in *Jones v. Alfred H. Mayer Co., supra,* 392 U.S. at 424–426, 88 S.Ct. 2186, 2195–2196 (1968), that

> "[I]f [§ 16] had been intended to grant nothing more than an immunity from *governmental* interference, then much of

---

**23.** For excerpts from those remarks, see p. 1139, *supra.*

**24.** For example, when the Senate passed H.R. 1293 on May 21, Senator Stewart moved to retitle "A bill to enforce the right of the citizens of the United States to vote in the several states of this Union" by adding "and for other purposes." Senator Stewart argued that retitling was necessary because "Here is a provi-

sion to enforce the fourteenth amendment." *Id.* at 3690.

Two days later, Senator Casserly moved (unsuccessfully) for a reconsideration of the bill because he and other Senators did not realize that the bill contained § 16, "what was known as a bill to enforce the fourteenth amendment." *Id.* at 3701. During the subsequent discussion of that motion, only the Fourteenth and Fifteenth Amendments were discussed.

[§ 17] would have made no sense at all. For that section, which provided fines and prison terms for certain individuals who deprived others of rights 'secured or protected' by [§ 16], was carefully drafted to exempt private violations of [§ 16] from the criminal sanctions it imposed. There would, of course, have been no private violations to exempt if the only 'right' granted by [§ 16] had been a right to be free of discrimination by public officials." (Footnotes omitted, emphasis in original.)

*Guerra v. Manchester Terminal Corp.,* 350 F.Supp. 529, 538 (S.D.Texas 1972), *aff'd.,* 498 F.2d 641 (5 Cir. 1974).[25]

This structural argument cannot support its conclusion. The Supreme Court in *Jones* based its decision that the 1866 Act applied to private racial discrimination not only on this structural argument but also on other parts of the legislative history. Corresponding reinforcement of the structural argument that the 1870 Act applies to private alienage discrimination is nonexistent. Furthermore, the qualifying phrase, "under color of state law," in § 17 is not superfluous if § 16 applies only to governmental discrimination against aliens. Private interference with a right secured against the states is entirely possible. For example, in *Lopez v. Arrowhead Ranches,* 523 F.2d 924, 927 n. 3 (9 Cir. 1975), the Court of Appeals said, "It may well be that Congress intended [in 42 U.S.C. § 1985(3)] to prevent private interference in the exercise of consti-tutional rights held against the state, [and] such legislation may well be a necessary and proper exercise of constitutional power under the enforcement clause of the Fourteenth Amendment." Without the qualifying clause in § 17 of the 1870 Act, that section could be interpreted as imposing criminal sanctions on private parties who prevented or hindered aliens from exercising rights which were secured against state interference by § 16. The Court's interpretation of the scope of § 16 does not make the qualifying clause in § 17 meaningless.

Another possible basis for interpreting the 1870 Act as applicable to private alienage discrimination involves § 18 of that Act, which provides that §§ 16 and 17 of the 1870 Act "shall be enforced according to the provisions of" the 1866 Act.[26] The court in *Guerra* relied heavily on § 18, the "clause that gives pause," in concluding that the 1870 Act reached private alienage discrimination. *Guerra v. Manchester Terminal Corp., supra,* 350 F.Supp. at 537–538. This Court respectfully cannot adopt that reasoning. Section 18 is on its face a procedural provision which involves the mode of enforcement of § 16, and this Court is reluctant to conclude that an apparently procedural clause requires a substantive change in the provision for whose enforcement it provides. Moreover, there is no indication in the legislative history that § 18 was intended to turn § 16 into a fundamentally different statute than it would otherwise have been.[27] Section 18 evolved from § 3 of

---

**25.** Section 17 provided:

"*And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."

**26.** Section 18 provided:

"*And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said act."

**27.** Defendants argue that certain comments of Senator Stewart demonstrate that § 18 was purely procedural. See Cong.Globe, 41st Cong., 2d Sess. 3560, 3561 (1870). The context of those remarks makes clear that Senator Stewart was referring to differences between the House bill, which made no provision for federal enforcement of voting rights, and the

S.365. The absence of any enforcement provisions in S.365 made it necessary to incorporate the enforcement provisions of the 1866 Act through § 3, but when S.365 was added on to S.810 and in turn to H.R. 1293, § 3 remained even though S.810 contained its own enforcement provisions. Section 18 can therefore be interpreted simply as a holdover from S.365. Section 18 was not completely unnecessary; although the enforcement provisions of the 1870 Act for the most part duplicated the enforcement provisions of the 1866 Act, the 1870 Act contained no provision corresponding to § 8 of the 1866 Act, which gave the President authority to reassign United States judges and marshals when necessary to enforce the 1866 Act.

Interpreting § 1981 to reach private conduct where racial discrimination is involved, but not where alienage discrimination is involved, creates an apparent internal inconsistency in the statute. That inconsistency is more apparent than real. Section 1 of the 1866 Act and § 16 of the 1870 Act were combined into a single section in the 1874 recodification of the federal laws. That recodification was not intended by Congress to enact any substantive changes in the federal civil rights laws. *Runyon v. McCrary, supra,* 427 U.S. at 168 n. 8, 96 S.Ct. 2586 (1976). Since the 1866 Act did not protect aliens at all and since the 1870 Act did not prohibit private alienage discrimination, § 1981 itself cannot be interpreted to reach such discrimination.

 Some courts have suggested that § 1981 should be interpreted in light of currently available federal remedies for types of discrimination which those courts believe should not be permitted. *See, e. g., Budinsky v. Corning Glass Works,* 425 F.Supp. 786, 787, 788–789 (W.D.Pa.1977). The scope of a statute enacted in 1870 cannot depend on the scope of a statute enacted in 1964. The fact that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, does not protect aliens

against private discrimination, *Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), does not give this Court the authority, whatever its feelings about discrimination against aliens, to rewrite § 1981. It is up to Congress to provide a remedy for private alienage discrimination if it concludes that such a remedy is desirable.

Insofar as plaintiff claims that defendants acted in their private capacity when they discriminated against him on the basis of his alienage, his complaint must be dismissed for failure to state a claim upon which relief can be granted.

## V. ORDER

IT IS HEREBY ORDERED that defendant NEII's motions to dismiss for lack of prosecution and for failure of service of process and to strike the class allegations are denied.

IT IS HEREBY FURTHER ORDERED that defendant IUEC's motion to dismiss for lack of subject matter jurisdiction is denied.

IT IS HEREBY FURTHER ORDERED that defendants' motion to dismiss plaintiff's Fifth Amendment claim for failure to state a claim upon which relief can be granted is denied.

IT IS HEREBY FURTHER ORDERED that defendants' motion to dismiss plaintiff's § 1981 claim for failure to state a claim upon which relief can be granted is granted.

IT IS HEREBY FURTHER ORDERED that if the parties conclude that motions for summary judgment are appropriate, they shall file and notice such motions for hearing at 9 A.M. on Thursday, November 3, 1977, or on such subsequent Thursday as may be necessary to prepare such motions for hearing.

Senate bill, which had extensive provisions on that subject. The Court's examination of the

legislative history of the 1870 Act uncovered no discussion of the intended function of § 18.