John R. DE MALHERBE, Plaintiff,

v.

INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, International Union of Elevator Constructors Local No. 8, National Elevator Industry, Inc., Defendants.

No. C–76–1668–CBR.

United States District Court, N. D. California.

July 16, 1979.

Dennis John Woodruff and David R. Lipson, San Francisco, Cal., for plaintiff.

Brundage, Beeson & Pappy, Stephen H. Naiman, Richard J. Davis, Jr., Los Angeles, Cal., O'Donoghue & O'Donoghue, Patrick C. O'Donoghue, Joyce A. Mader, Washington, D. C., for defendants IUEC and IUEC Local No. 8.

Carter, Cook & Voltz, Charles E. Voltz, San Francisco, Cal., Putney, Twombly, Hall & Hirson, Charles O. Strahley, New York City, for defendant National Elevator Industry, Inc.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

Plaintiff John R. De Malherbe brought this suit against the International Union of Elevator Constructors ("IUEC") the International Union of Elevator Constructors Local No. 8 ("Local 8"), and National Elevator Industry, Inc. ("NEII"), alleging that defendants had violated his rights under 42 U.S.C. § 1981 and the Fifth Amendment of the United States Constitution.[1] Plaintiff, a permanent resident alien, claims that he was denied admission to the Elevator Industry National Recruitment and Training Program ("EINRTP") because he was not a United States citizen.[2] EINRTP is a national program that recruits, trains, and hires minorities and other workers to become probationary employees and subsequently to become elevator constructor helpers and mechanics. It was created by an Agreement and Declaration of Trust entered into by NEII and IUEC on May 31, 1973. Prior to the formal creation of EINRTP, NEII, as bargaining representative of certain employers in the elevator construction and repair industry, and IUEC, on behalf of the local unions, entered into a collective bargaining agreement in which they resolved to establish such a program.

From June 1973 until May 1975, one requirement for admission to EINRTP was that the applicant be a United States citizen. Plaintiff alleges in the second amended complaint not only that he was denied participation in the training program but also that his name was removed from Local 8's hiring list because he was not a United States citizen and that this removal from the hiring list "was a direct and proximate result of the aforedescribed United States citizenship requirement for entry into the job recruitment and training program."[3]

■ In an earlier memorandum of opinion, this Court granted defendants' motion to dismiss plaintiff's § 1981 claim on the ground that Congress had not intended § 1981 to apply to claims of private discrimination against aliens. *De Malherbe v. International Union of Elevator Constructors*, 438 F.Supp. 1121, 1136–1142 (N.D.Cal.1977). Plaintiff, therefore, must now rely solely on his Fifth Amendment claim. Since the Fifth Amendment's restrictions do not apply to wholly private conduct,[4] plaintiff

---

1. Jurisdiction over the § 1981 claim was based upon 28 U.S.C. § 1343. Plaintiff's Fifth Amendment claim is brought under 28 U.S.C. § 1331, the general grant of federal question jurisdiction. Plaintiff alleges that the amount in controversy exceeds $10,000. The second amended complaint also states that the jurisdiction of the court is invoked pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202. Yet the complaint does not specifically request declaratory relief.

2. In his first and second amended complaints, plaintiff sought to represent a class of similarly situated aliens. On May 3, 1979, the Court granted plaintiff's motion to strike the class allegations of the second amended complaint on the ground that the class members were not sufficiently numerous to warrant a class action.

3. Second Amended Complaint, at ¶ 14, p. 5.

4. *See Public Utilities Commission v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 96 L.Ed. 1068 (1952).

must establish that the federal government was sufficiently involved with EINRTP that the exclusion of aliens from the program may be characterized as "federal action."

Defendants previously moved to dismiss plaintiff's Fifth Amendment claim for failure to state a claim on the ground that the allegations of the complaint failed to establish the requisite federal action. In the second amended complaint, plaintiff alleged on information and belief that EINRTP had been created in response to governmental pressure, as various agencies of the United States government had "expressed their interest and concern to [IUEC and NEII] about the paucity of ethnic minority employees in the elevator construction industry." [5] Plaintiff further alleged that EINRTP was funded by the Manpower Administration of the United States Department of Labor and that the United States Office of Federal Contract Compliance ("OFCC") regularly monitored the program and closely scrutinized the performance of IUEC and NEII to ascertain whether the federal goals for minority employment were being met.

After discussing the federal action issue at some length, this Court denied defendants' motion to dismiss, concluding that "[g]overnmental action is so fact-specific that the Court must know more details about the federal involvement in EINRTP [sic] before it can conclude that defendants' conduct is or is not attributable to the federal government for purposes of the Fifth Amendment." 438 F.Supp. at 1134.

Although plaintiff's complaint did not provide detailed factual allegations pertaining to federal action, the Court concluded that dismissal on the pleadings would be inappropriate, for a Rule 12(b)(6) motion should not be granted unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " De Malherbe, supra, 438 F.Supp. at 1134, quoting Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court noted, however, that the federal action issue might well be resolved through a motion for summary judgment. 438 F.Supp. at 1135.

## I. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT—FEDERAL ACTION

Plaintiff has moved for summary judgment on the issue of liability and has requested a separate trial on damages.[6] The parties' briefs on the motion for partial summary judgment focus primarily on the issue of federal action. Plaintiff contends that the undisputed facts warrant a finding of federal action for two independent reasons: (1) the federal government's involvement in EINRTP was so significant that defendants and the federal government should be considered "joint participants" in EINRTP, under the state action test set forth in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); and (2) the federal government directly approved and fostered EINRTP's citizenship requirement, thereby meeting the "nexus test" of Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Defendants concede that the federal government participated in establishing EINRTP, provided federal funding, and monitored the progress of the program, yet they contend that the government's involvement was not substantial enough to meet the standards established in Burton. Furthermore, defendants vigorously contest plaintiff's conclusion that the citizenship requirement was condoned, approved, or supported by the federal government. The Court agrees that the Jackson test has not been met in this case. However, under controlling Ninth Circuit case law, the undisputed facts in this case compel a finding of federal action under the Burton doctrine.

### A. Factual Background

Plaintiff's motion for summary judgment is supported by numerous documents

---

5. Second Amended Complaint, at ¶ 9, pp. 2–3.

6. See Davis v. Passman, —— U.S. ——, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

concerning the government's involvement in the creation and implementation of EINRTP [7] and by the deposition testimony of Rodger Coyne, who served as the federal representative for EINRTP on behalf of the Manpower Administration of the Department of Labor during the first two years EINRTP was in operation. Many of the factual matters plaintiff seeks to establish through these documents and through the deposition testimony are not contested by defendants. Yet the parties draw different conclusions from the underlying facts.

In support of his contention that EINRTP was created in response to governmental pressure, plaintiff has submitted a memorandum concerning a meeting held on September 22, 1971, attended by representatives of NEII, IUEC, and OFCC. The memorandum states that OFCC's Assistant Director in charge of construction compliance "advised that it was OFCC's opinion that there was a dearth of minority employees in the Elevator Industry and that this Industry was a target of OFCC," so that if voluntary plans to increase the number of minority employees were not adopted, "the Federal Government would step in and impose a Plan on the Industry where trouble arises * * *." [8]

Defendants are unwilling to concede that EINRTP was created as an alternative to a plan being imposed on the industry. In rebuttal, they rely primarily on the affidavit of Francis X. McBride, who, as a member of NEII, had been active in the development of EINRTP and who served on EINRTP's Board of Trustees from June 1973 to October 1974. In November or December 1971, McBride was asked by the Executive Director of NEII to help draft an affirmative action program that might be operated jointly by NEII and IUEC. It appears from McBride's affidavit that he was then unaware of the September 1971 meeting with OFCC officials and believed that NEII and IUEC had spontaneously initiated the development of an affirmative action plan for the industry. However, McBride's affidavit also states that at a February 1972 meeting of the NEII–IUEC Subcommittee on Equal Employment Opportunity, "discussions centered on the urgency of developing an Industry affirmative action program so as to avoid possible citation of various member companies by various Governmental agencies for noncompliance on affirmative action matters." [9]

Defendants argue that EINRTP was a voluntary program, freely adopted by NEII and IUEC. Although it may well be that EINRTP would have been developed even in the absence of governmental pressure, the undisputed facts indicate that OFCC pushed for adoption of a "voluntary plan." This circumstance is not a critical factor in the Court's analysis of the federal action issue, yet it does lend support to a finding of significant governmental involvement.

EINRTP was ultimately approved by OFCC as an acceptable affirmative action plan. The formal notification of approval, issued in April 1974, stated: [10]

"The national office of OFCC has worked for approximately three (3) years with the National Elevator Industry [NEII] to develop an acceptable affirmative action program designed to correct

7. These documents include the contract between EINRTP and the Department of Labor, the NEII/IUEC collective bargaining agreement, the minutes of EINRTP Board of Trustees meetings, and the trust agreement creating EINRTP. Plaintiff obtained these documents from defendants through discovery. Defendants have not raised any objections as to the authenticity of the documents nor have they contested plaintiff's assertion that the documents would all be admissible evidence at trial.

8. Memorandum prepared by Edward Callan, counsel for NEII, concerning September 22, 1971, meeting attended by representatives of NEII, IUEC, and OFCC.

9. Affidavit of Francis X. McBride, at ¶ 11, pp. 4–5.

10. The notification of plan approval also stated that local unions would not be required to adopt local affirmative action plans "providing that the NEII/IUEC strictly adhere to the program requirements developed by their representatives and approved by OFCC" and that the NEII/IUEC plan would be monitored by OFCC.

the underutilization of minority workers in the industry." [11]

Plaintiff has submitted this letter as evidence of OFCC's participation in the development of EINRTP. In response, defendants rely on McBride's affidavit, which describes meetings concerning the development of the program held by the NEII/IUEC Equal Employment Opportunity Committee and the EINRTP Board of Trustees. The affidavit indicates that although OFCC officials were sometimes present at these meetings, they did not concern themselves with details of program development and administration, but rather directed their remarks to the requirements for obtaining OFCC approval of EINRTP as an acceptable affirmative action program.

Plaintiff's argument that the federal government was significantly involved in EINRTP is based in part on OFCC's ties with the program but is primarily based on the funding and supervision of EINRTP provided by the Manpower Administration of the Department of Labor. On June 22, 1973, the Manpower Administration entered into a contract with EINRTP in which the Manpower Administration agreed to fund the training program proposed by NEII and IUEC. This federal assistance provided 100% of the funding required for EINRTP's operation.[12] The Manpower Administration provided funding initially under the Manpower Development and Training Act of 1962 ("MDTA"), 42 U.S.C. §§ 2571 et seq., and later under the Comprehensive Employment and Training Act of 1973 ("CETA"), 29 U.S.C. §§ 801 et seq. Both statutes provide for federal support of job training programs. CETA particularly emphasized providing job training and employment opportunities "for economically disadvantaged, unemployed, and underemployed persons." 29 U.S.C. § 801.

The contract with the Department of Labor provided that a Manpower Administration representative would monitor the program's performance. The contract also stated that EINRTP would submit monthly financial reports and monthly reports on the progress and activities of the program.

Defendants do not dispute plaintiff's factual assertions regarding funding and the contractual provisions for monitoring and reporting. They argue, however, that plaintiff has overemphasized both the importance of federal funding and the degree of supervisory power exercised by the Manpower Administration. McBride's affidavit describes the various methods of funding the program that were considered in the fall of 1975 and spring of 1976 as alternatives in the event that federal funding was discontinued. The affidavit also states that after federal funding was terminated in the fall of 1977, the program continued, in accordance with the July 1977 collective bargaining agreement. Thus, defendants argue that although the program was entirely federally funded for several years, it was not dependent upon federal funding.

With respect to the issue of government supervision of the program, defendants stress that under the program proposal, incorporated into the contract with the Department of Labor, and under the trust agreement, the operation and administration of the program was placed in the hands of EINRTP's Board of Trustees, composed of three trustees designated by NEII and three trustees designated by IUEC. The trust agreement also provided that two National Directors, one appointed by NEII and one by IUEC, serving under the Board of Trustees, would be "responsible for the directing, supervising, planning and overall implementation of the National Program" [13] and would prepare all reports required by the contract with the Department of Labor. McBride's affidavit supports defendants'

---

11. Formal notification of OFCC approval of NEII/IUEC affirmative action plan, at 1.

12. See Response of Defendant IUEC to Plaintiff's Interrogatories, Interrogatory 27 at p. 29:

"The Manpower Administration funded 100% of the costs of operating EINRTP from June 22, 1973 through October 31, 1977."

13. Agreement and Declaration of Trust between NEII and IUEC, Art. VI, Sec. 1(b), at p. 18.

contention that EINRTP was administered by the Board of Trustees and the National Directors, although the government required periodic financial accounting and reports on the progress of the program.[14] The affidavit sets forth in some detail the substance of the Board of Trustees' meetings from June 1973 to November 1976, noting that frequently no government representative attended the meeting and that the Board of Trustees, working with the National Directors, generally administered the program without any government input.

McBride's affidavit does not conflict with the deposition testimony of Rodger Coyne. Coyne states in his deposition that one of the field representative's tasks was to attend an early meeting of the contractor group in order to explain the requirements under the contract. Since the Manpower Administration had no field staff or regional offices, Coyne, based in Washington, D.C., kept in touch with EINRTP administrators through letters and telephone calls and by reviewing EINRTP's monthly reports. Asked whether his monitoring of the program included review of the particular recruitment, testing, and notification procedures used in each city, or whether the Department of Labor simply provided general guidelines governing such matters, Coyne responded:

"General guidelines plus our review of the reports as they came in, and my reading of those reports, and if in reading them I sensed something lacking I would call Columbus, Ohio where they operated this program from, and talk to one of the two co-directors." [15]

Although it appears that Coyne's function was primarily to monitor the general progress of the program, rather than to supervise its day-to-day operation, Coyne does cite instances of his involvement in fairly minor details of program administration. For example, Coyne was consulted periodically about permissible travel expenses, since EINRTP's contract with the Department of Labor contained specific limitations on travel expenses, as well as restrictions on fringe benefits, vacations, and sick leave.[16]

The final factual matter considered in the briefs on the federal action issue is the government's involvement with the EINRTP citizenship requirement challenged by plaintiff in this lawsuit. Coyne testified at his deposition that when he originally reviewed the program proposal submitted by NEII and IUEC, prior to negotiation of the contract between EINRTP and the Department of Labor, he underlined the provision relating to the citizenship requirement, noted under it "I think this is illegal," and initialed the notation.

14. See Affidavit of Francis X. McBride, describing a June 1973 meeting of the EINRTP Board of Trustees, attended by Rodger Coyne of the Department of Labor:
"Mr. Coyne gave general background information as to submission of reports and invoices. He emphasized that the Trustees were responsible for the operation of the program and that the National Directors would be answerable to the Trustees. His main concern was the importance of submitting invoices early and maintaining a good set of books. He advised that the Trustees should have regular periodic meetings to discuss the program with the Directors and that the Trustees should receive monthly written reports from the Directors. * * * Mr. Coyne also met with the National Directors to go over forms and invoices that were to be submitted to the Government." Paragraph 20D, pp. 12–13.

15. Deposition of Rodger Coyne, at 30–31.

16. In response to defendants' contention that the government was not significantly involved in the administration of EINRTP, plaintiff submitted an April 19, 1974 letter from the business manager of Local 8 to the directors of EINRTP. The letter refers to the recent testing of certain applicants for admission to EINRTP, including plaintiff John De Malherbe, and states that "we were very fortunate to have Mr. Ed Johnson, the liaison man from the Labor Department who supervised the whole operation and personally ranked the applicants in the order of the raw score and personally computed the bonus allowed for Veterans Preference." Although this letter certainly supports plaintiff's assertion that the Department of Labor's supervision of EINRTP went beyond general review of the program's progress, the letter does not provide any indication of the extent of the government's involvement in the day-to-day operation of the program.

Coyne believes that this conclusion was based on his recollection of a Manpower Administration policy against exclusion of aliens. Coyne faintly recalled bringing the EINRTP citizenship requirement to the attention of one other person but could not recall the name of the individual. Coyne apparently assumed that the provision he underlined would be deleted, for he stated, "I would expect that the other people in the office or our contracting unit, if that clause inadvertently remained in there would spot it." [17] However, the citizenship requirement remained in the program proposal, which was incorporated in the 1973 contract between EINRTP and the Department of Labor, and Coyne does not recall that the provision was ever discussed during contract negotiations.

Coyne did not become aware that the citizenship requirement had been included in the 1973 contract until May 1975, when he was contacted by a law clerk from the San Francisco Neighborhood Legal Assistance Foundation, who informed him that John De Malherbe had been excluded from EINRTP because he was an alien. When Coyne discovered that the citizenship requirement had been retained, he made certain that it was deleted in the 1975 contract. Coyne discussed the citizenship requirement with EINRTP's Board of Trustees at a June 1975 meeting and told them that the requirement had been retained in the 1973 contract by mistake.[18] He asked them to give De Malherbe an opportunity to apply to EINRTP without regard to his alien status and stated that not only was it against Manpower Administration policy to exclude aliens from programs, but that the 1975 CETA regulations specifically stated that citizenship could not be used as a criterion for participation in a CETA-funded program. *See* 29 C.F.R. § 95.32(d) (1975).[19]

Coyne does not recall any objection from EINRTP's Board of Trustees or the National Directors to the deletion of the citizenship requirement in the 1975 contract.

### B. *Legal Analysis*

■ Plaintiff urges the Court to find federal action in the operation of EINRTP on either one of two independent grounds: (1) that the federal government was a joint participant in the program, and (2) that the federal government approved and encouraged the citizenship requirement. The second argument focuses on the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), in which the Court applied the "nexus test" to determine whether state action existed.[20] In *Jackson* the Court rejected the notion that mere state regulation of an enterprise could convert its activities into state action. Rather,

"the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453, *citing Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

In order to satisfy the "nexus test," the plaintiff must establish that the government affirmatively supported the challenged activity of the private defendant. *See Cannon v. University of Chicago*, 559 F.2d 1063, 1070–1071 (7 Cir. 1976); *rev'd on other grounds*, —— U.S. ——, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Driscoll v. International Union of Operating Engineers, Local 139*, 484 F.2d 682, 690 (7 Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). This burden is not met

---

17. Deposition of Rodger Coyne, at 22.

18. Coyne's deposition testimony concerning this meeting is further supported by the minutes of that meeting and by McBride's description of the meeting.

19. The 1975 contract was funded under Title III of CETA. Although the regulations Coyne referred to covered Title I programs, regulations

published in 1976 applied the same standard to Title III programs. *See* 29 C.F.R. § 97.320 (1976).

20. The Court's analysis of the federal action issue will presume that standards applicable to state action are also applicable to federal action. *See* p. 662, *infra*.

merely by showing that the government failed to act to prevent the defendant's actions. In *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978), the Supreme Court emphasized that it had "never held that a State's mere acquiescence in a private action converts that action into that of the state." The Court interpreted *Jackson* and its earlier decision in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), as rejecting the notion that private action can be subjected to constitutional restraints "by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" 436 U.S. at 164–165, 98 S.Ct. at 1738. In *Flagg Bros.*, the Court noted at several points in the opinion that the state had not compelled the actions challenged in that suit. *Flagg Bros.* has therefore been interpreted as leaving open the question of "when even 'affirmative support' short of compulsion will suffice to render a private act attributable to the state." *Musso v. Suriano*, 586 F.2d 59, 62 (7 Cir. 1978) (footnote omitted), *cert. denied*, 440 U.S. 971, 99 S.Ct. 1534, 59 L.Ed.2d 788 (1979).

Plaintiff argues in this case that the Department of Labor "required" EINRTP to impose a citizenship requirement by incorporating in the funding contract the NEII/IUEC program proposal containing that requirement. Plaintiff also views Coyne's notation regarding the apparent illegality of the citizenship requirement, followed by the government's failure to delete the requirement during contract negotiations, as evidence of governmental encouragement or approval of the program's exclusion of aliens. Yet the material submitted in support of plaintiff's motion merely establishes that the citizenship requirement was retained in the 1973 contract by mistake. Particularly in light of the admonition in *Flagg Bros.* that a finding of state action cannot be based on the government's inaction, it is clear that a ruling in favor of plaintiff on the federal action issue could not be based on a finding of sufficient governmental nexus with the challenged actions of defendants.

The alternative theory advanced by plaintiff is that the federal government was so intimately involved with EINRTP that the government should be considered a "joint participant" in defendants' programs. This theory is based upon the Supreme Court's decision in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), in which the Court concluded that

> "[t]he State [had] so far insinuated itself into a position of interdependence with [defendant restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall within the scope of the Fourteenth Amendment." 365 U.S. at 725, 81 S.Ct. at 862.

In *Burton*, a restaurant that leased space in a public parking building refused to serve the plaintiff, because he was a Negro. Although the governmental entity, the parking authority, had not affirmatively supported the discrimination, the Court noted that the lease could have contained a provision prohibiting racial discrimination by the lessee. 365 U.S. at 720, 81 S.Ct. 856. The Court emphasized that the restaurant was in a public building, flying state and national flags, that the parking authority had entered into commercial leases in order to help finance the parking facility, and that the restaurant and parking facility each benefitted from the other's existence. Characterizing the relationship as one of "interdependence," the Court found that by its inaction the parking authority, and through it the state, had "elected to place its power, property and prestige behind the admitted discrimination" and had thus made itself a party to the lessee's discriminatory actions. 365 U.S. at 725, 81 S.Ct. at 862.

*Burton*'s emphasis on the government's inaction seems at odds with *Jackson*'s focus on whether the government affirmatively supported the challenged activity, particularly in light of the statement in *Flagg Bros.* that inaction cannot be characterized as support or encouragement. Yet in *Jack-*

*son* the Court referred to the *Burton* decision with apparent approval, finding that the "symbiotic relationship" present in *Burton* had not been established in *Jackson*. Many courts have considered the viability of the *Burton* doctrine after *Jackson* and have concluded that the test adopted in *Burton* was not entirely displaced by the nexus test. The Court of Appeals for the First Circuit, after analyzing the effect of the *Jackson* decision, concluded:

> "The essence of *Burton* which survives *Jackson* is that the relationship between the state and the private institution may be so intertwined that the state will be held responsible for conduct of the institution with which it had no direct connection." *Downs v. Sawtelle*, 574 F.2d 1, 9 (1 Cir. 1978) (footnote omitted), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978).

Similarly, the Court of Appeals for the Third Circuit has interpreted the Supreme Court's decisions in *Burton* and *Jackson* as establishing two methods by which the government's significant involvement with a private party's action may be established. Either the state may have directly supported the challenged activity or the state may be so pervasively involved in the private enterprise that it is considered a participant in the entire enterprise. *See Chalfant v. Wilmington Institute*, 574 F.2d 739, 744–746 (3 Cir. 1978) (*en banc*); *Braden v. University of Pittsburgh*, 552 F.2d 948, 956–958 (3 Cir. 1977) (*en banc*); *Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382, 383–384 (3 Cir. 1976).

Plaintiff's contention that the federal government should be considered a joint participant in EINRTP is based primarily on the federal funding of the program and on the monitoring and supervision that accompanied that funding. In addition, plaintiff attaches some weight to the fact that the program apparently was developed at least partially as a result of governmental pressure. Defendants respond that although the program was entirely federally funded, it was not dependent on federal funding, as shown by the fact that the program continued after funding was terminated. Furthermore, they characterize the Department of Labor's supervision of the program as superficial and emphasize that the Board of Trustees, composed entirely of representatives of NEII and IUEC, was responsible for administering the program. Finally, they argue that *Burton* is not applicable because plaintiffs have failed to establish that EINRTP and the Department of Labor enjoyed a truly "symbiotic" relationship.

In many respects, defendants' arguments are premised on a narrow reading of the *Burton* decision. The Supreme Court's reliance in *Burton* on the "joint participant" theory of state action was accompanied by the admonition that there are no "readily applicable formulae" for determining whether state action is present and that the issue can only be resolved "in the framework of the peculiar facts or circumstances" of each case. 365 U.S. at 725–726, 81 S.Ct. at 862. Consequently, in cases like the one at bar, where the factual circumstances are quite dissimilar from those presented in *Burton*, the reach of that decision is not readily apparent. The Court in *Burton* counseled against a broad reading of the opinion, commenting that due to the "largeness" of government, many relationships between private parties and a governmental entity might at first appear to create "state action," but that the facts of each case must be examined closely.

Consistent with this concern that governmental involvement with private parties should not too readily be deemed to convert private action to government action, many circuit courts of appeal have concluded that government funding of a private enterprise is not a sufficient ground for a finding of state or federal action. *See, e. g., Musso v. Suriano, supra*, 586 F.2d at 63; *Bethel v. Jendoco Construction Corp.*, 570 F.2d 1168, 1176 (3 Cir. 1978); *Spark v. Catholic University of America*, 167 U.S.App.D.C. 56, 61, 510 F.2d 1277, 1282 (D.C.Cir. 1975); *Ascherman v. Presbyterian Hospital of Pacific Medical Center, Inc.*, 507 F.2d 1103 (9 Cir. 1974); *Wahba v. New*

*York University*, 492 F.2d 96 (2 Cir. 1974), *cert. denied*, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). *See also Greenya v. George Washington University*, 167 U.S. App.D.C. 379, 383, 512 F.2d 556, 560 (1975),[21] *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975). As the Court of Appeals for the Third Circuit stated in *Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382 (3 Cir. 1976):

> " '[R]eceipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government.' " 545 F.2d at 385, *quoting Grossner v. Trustees of Columbia University*, 287 F.Supp. 535, 547–548 (S.D.N.Y.1968).

Several courts have explicitly considered the relevance of conditions attached to government grants and have concluded that in many cases these restrictions would not be a sufficient basis for a finding of government action. In *Greenya v. George Washington University, supra*, for example, the court stated that a private institution's exemption from federal taxation would not establish federal action, and then concluded that in many respects financial support is analogous to tax exemption:

> "Such support is generally provided to a large class of qualified organizations and does not involve government in the actual management of the funded program. * * * Although the conditions attached to direct grants, loans, or loan guarantees might be somewhat more detailed and exacting than those for tax exempt status, the distinction does not become significant until the conditions become so all pervasive that the Government has become, in effect, a joint venturer in the recipient's enterprise." 512 F.2d at 561 (footnote omitted).

Similarly, in *Wahba v. New York University, supra*, the court held that a federally funded research project did not constitute government action despite certain restrictions contained in the grant. The court noted that in *McQueen v. Druker*, 438 F.2d 781, 784–785 (1 Cir. 1971), the Court of Appeals for the First Circuit had based a finding of government action on the proposition that

> "at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent contractor, the coloration of state action fairly attaches." 492 F.2d at 103.

However, the court distinguished *McQueen* on the ground that the grant conditions in *Wahba* did not circumscribe the decision-making power of the grantee, for the grantor, the National Institute of Health, did not intend to share the responsibility of administering the research project. 492 F.2d at 100, 103.

The need to inquire into the degree of government involvement in the actual administration or control of a government funded program was emphasized by the Court of Appeals for the Seventh Circuit in *Musso v. Suriano, supra*. The *Musso* decision involved three cases in which plaintiffs had sought to establish state or federal action primarily on the basis of substantial government funding accompanied by regulatory measures. The court rejected plaintiffs' contention that a high level of government financial support, without more, could give rise to state or federal action and held that in each of the three cases the allegations of the complaint did not support a claim of state action premised on the "state instrumentality" theory adopted in *Burton*:

> "[A]n allegation * * * that the ostensibly private entity has acted as a state instrumentality * * * is dependent upon more than funding; it is

---

21. In *Greenya*, the court concluded:

"With the possible exception of racial discrimination by recipients of government funding, we believe that mere financial support for particular projects * * * represents insufficient governmental involvement" to "trigger constitutional guarantees for those dealing with the recipient." 512 F.2d at 560.

dependent upon facts suggesting control. * * * [M]ere allegations of state funding and general regulation, without some evidence of state administration or practical control, are insufficient." 586 F.2d at 63 (citations omitted).

*Musso* does not describe the degree of government intrusion into the administration or control of a government-funded private program that would be adequate to support a claim that the enterprise operated as a government instrumentality. Since funding is generally accompanied by certain restrictions and directions for use of the funds, the statement that funding alone is insufficient to establish state action "without some evidence of state administration or practical control" does not establish a readily applicable standard. However, the decisions cited in *Musso* in support of this statement do indicate that one important factor is whether the governing body of the private institution is dominated by government representatives. In *Downs v. Sawtelle, supra,* 574 F.2d 1, for example, the Court of Appeals for the First Circuit held that the state was a "joint participant" in the operation of a town's community hospital, since any profits earned by the hospital were to be distributed to the town, the hospital was partially government funded, and the entire board of directors of the hospital was appointed by the town's Board of Selectmen. The court viewed the appointment of the board by local government officials as "the most compelling factor" supporting a finding of state action, noting that

"[o]ther courts have also held that the appointment by the state of a majority of an institution's board is either determinative of state action or an important factor in establishing state action." 574 F.2d at 8 (citations omitted).

The court distinguished *Aasum v. Good Samaritan Hospital,* 395 F.Supp. 363 (D.Ore. 1975), *aff'd,* 542 F.2d 792 (9 Cir. 1976), a case in which only three of the seven members of the hospital's governing board were appointed by public institutions. In *Aasum* the district court had relied in part upon the fact that these members constituted only a minority of the board. 395 F.Supp. at 368. The Ninth Circuit Court of Appeals, affirming the district court's decision, concluded that although the three public institutions each appointed a member of the public to serve on the board, these members did not represent the institutions. Since the public entities therefore did not have any "management duties or responsibilities" involving the hospital, the Ninth Circuit Court of Appeals agreed that the composition of the board did not support a finding of state action.

Defendants in the case before this Court argue that the operation of EINRTP did not involve federal action, since the federal government did not exercise control over the program and since the responsibility for administering the program was vested in a board of trustees composed entirely of representatives of private entities. Under the approach taken in *Downs v. Sawtelle, supra,* if a majority of the EINRTP trustees were public officials, this would be sufficient to support a finding of government action. The fact that the EINRTP trustees are all appointed by private entities does not necessarily mean that the program is not sufficiently controlled by the government to be considered a government instrumentality, yet it does support that conclusion. On the other hand, plaintiff has presented evidence of fairly detailed contractual conditions imposed on EINRTP by the Department of Labor, including restrictions on travel expenses and vacations and a requirement that monthly progress reports and financial reports be submitted. In addition, although the Manpower Administration's commitment to "monitor and supervise" the program did not place responsibility for particular management duties in the hands of the Administration's representative, Rodger Coyne's testimony indicates that he was consulted periodically on fairly minor details of the program's operation.

■ Whether the government's "control" of this program and its input into the administration of the program should be con-

sidered sufficient to label EINRTP a "government instrumentality" under the *Burton* doctrine would appear to this Court to be a close question. The Court, however, is compelled to find that the operation of EINRTP did involve federal action, since the circumstances of this case cannot be distinguished from the facts presented in *Mathis v. Opportunities Industrialization Centers, Inc.*, 545 F.2d 97 (9 Cir. 1976) (*per curiam*). In *Mathis* an employee discharged by Opportunities Industrialization Centers, Inc. ("O.I.C."), a nonprofit corporation, brought a suit against O.I.C., claiming that the dismissal violated her due process rights under the Fifth Amendment. The district court found no federal action and dismissed the suit. The Court of Appeals for the Ninth Circuit reversed, holding that the stipulated facts established federal action, based on the federal government's relationship with O.I.C.:

"O.I.C. is a non-profit corporation with regional offices in various parts of the United States, including San Francisco. Its principal reason for existence is to perform under contract with the United States Government, pursuant to the authority of the Manpower Development And Training Act of 1962 (42 U.S.C. §§ 2571 *et seq.*). The goal of its activities apparently is to provide vocational training and retraining to people of marginal employability. Approximately 95% of O.I.C.'s income has been derived from its contracts with the Federal Government.

"Under such contracts, substantial controls by the Federal Government were imposed upon O.I.C. For example, O.I.C. was obliged to submit monthly summary reports to the Department of Labor with respect to performance of its management training schools and other activities during the current month and its objectives for the following month. It was also required to submit quarterly reports to H.E.W. concerning its institutional training activities on a regional basis. Salaries for O.I.C. employees were limited to specified amounts unless increases were allowed by the contracting officer, an official of the United States Govern-

ment. O.I.C. was prohibited from engaging its own auditors, being obliged, instead, to submit to audits performed or arranged by the Department of Labor. O.I.C.'s billing procedures and forms were required to be those prescribed by the United States Government. Another contractual provision asserted that the United States Department of Education and the Department of Labor are jointly responsible for administering the program of O.I.C." 545 F.2d at 97–98.

The federal government's involvement with the O.I.C. program was clearly very similar to its involvement with EINRTP. Although plaintiff has primarily emphasized the contractual requirement that monthly reports be made to the Department of Labor, the Court notes that the June 1973 contract between EINRTP and the Department of Labor also contained a provision pertaining to audits that is substantially similar to the one described in *Mathis*. The statement of facts in *Mathis* does not describe the composition of the governing board of O.I.C. It does state that under the contract the Department of Labor and the Department of Education were jointly responsible for "administering" the program, yet the thrust of this provision seems to be that these two government entities would jointly monitor the program, rather than that public officials would actually serve as administrators.

The court in *Mathis* relied heavily on an earlier Ninth Circuit case, *Ginn v. Mathews*, 533 F.2d 477 (9 Cir. 1976). The court stated that the federal involvement in *Mathis* was at least as substantial as that in *Ginn* and that "the reasoning and the authorities set forth [in *Ginn*] are equally pertinent and controlling here." 545 F.2d at 98. *Ginn* and *Mathis* together indicate that the Court of Appeals for the Ninth Circuit is willing to base a finding of government action on government funding accompanied by substantial contractual restrictions without a detailed inquiry into the degree of administrative responsibility or control vested in the entity that provided the funding. In *Ginn* the court held that a Project Head-

start program was a government instrumentality under *Burton*, since it received substantial funding from the federal government and, "[a]s might be expected, the generous purse was not made available without the ever-present strings attached," 533 F.2d at 480 (footnote omitted). The program may well have been substantially controlled by the federal government, since the court noted that

"[n]umerous restrictions and conditions were imposed on EOC by the federal government, and it even prepared a manual for operations called the 'Headstart Policy Manual' * * *." 533 F.2d at 480.

The court did not expressly focus on administration or control of the program, however. Moreover, it disapproved of the Fifth Circuit opinion relied on by the trial court, *Hines v. Cenla Community Action Committee, Inc.*, 474 F.2d 1052 (5 Cir. 1973). In that case, the court had found no federal action despite substantial federal funding accompanied by numerous grant conditions, since the funding agency "did not control the activities" of the private corporation. *Hines, supra*, 474 F.2d at 1058. The court viewed the case as analogous to *Robles v. El Paso Community Action Agency, Project Bravo, Inc.*, 456 F.2d 189 (5 Cir. 1972), in which it had stressed that grant terms and conditions such as

"requirements that funds be spent only for purposes specified in the approved application, requirements for accountability by means of internal fiscal controls, regular financial reports, and independent audits, and assurances against * * discriminatory treatment of beneficiaries on grounds of race or color * * * [did not give the funding agency] the right to direct the manner of carrying out the

approved program * * *." 456 F.2d at 190–191.

Perhaps *Ginn* merely disagreed with the result in *Hines* rather than disagreeing with its focus on the degree to which the government controlled the operation of the program. However, neither *Ginn* nor *Mathis* considered the issue of control in any detail. *Mathis* in particular seems to establish that the Court of Appeals for the Ninth Circuit views the type of grant conditions present in this case as sufficient evidence of government involvement to compel a finding of government action.

In light of the *Mathis* decision, this Court finds it unnecessary to consider in depth several possible bases for distinguishing *Burton* suggested by the Court's prior opinion and by defendants. First, the Court noted earlier that the test for federal action might differ somewhat from the test for state action, although courts generally seem to have assumed that the two are identical. *De Malherbe, supra*, 438 F.Supp. at 1131 n. 6. Even if the two tests did not entirely coincide, *Mathis* would still be controlling authority, for it involved a finding of federal action.

Second, the Court of Appeals for the Ninth Circuit has suggested that a less rigorous government action test should be applied in cases involving racial discrimination. *See Aasum v. Good Samaritan Hospital, supra*, 542 F.2d at 794. The Supreme Court has not made such a distinction,[22] however, and it may well be that the distinction apparent in the cases can simply be attributed to a greater readiness to find state action where racial discrimination is involved, rather than a principled decision that different standards ought to apply where different types of interests are at stake.[23] The Court noted in its earlier opin-

---

**22.** *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 373–374, 95 S.Ct. 449, 465 (1974) (Marshall, J., dissenting):

"The Court has not adopted the notion, accepted elsewhere, that different standards should apply to state-action analysis when different constitutional claims are presented."

**23.** *See Ascherman v. Presbyterian Hospital of Pacific Medical Center, Inc.*, 507 F.2d 1103, 1106 (9 Cir. 1974) (Duniway, J., concurring):

"I think it fair to say that federal courts, rightly or wrongly, are more likely to find state action where race discrimination is involved than in due process types of cases, like the case at bar."

ion that even if different tests should be applied, it is arguable that alienage discrimination should not be judged by the same standard as racial discrimination. *De Malherbe, supra,* 438 F.Supp. at 1133 n. 7. *Mathis* involved a due process claim, which is arguably governed by the more rigorous standard, and yet the court found government action. Thus *Mathis* would certainly support a finding of federal action in this case.

Finally, defendants have attempted to distinguish *Burton* on the ground that the necessary "symbiotic relationship" does not exist in this case, since the Department of Labor was not dependent on EINRTP in the same way that the parking authority in *Burton* was dependent on the restaurant. The cases following *Burton* do not support the view that mutual financial dependence is necessary to meet the *Burton* test. In *Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974), the court specifically rejected the argument that the state must be financially dependent on the private party in order to find state action:

"Although in *Burton* such was the case, we believe this factor to be merely another incidental circumstance to be considered in the sifting and weighing process and not an indispensable ingredient without which 'state action' can not be proven. There appears to be no logical reason to make a finding of 'state action' dependent upon the State receiving financial benefits." 386 F.Supp. at 1004.[24]

At any rate, the benefits afforded the government in *Mathis* through O.I.C.'s operation of vocational training programs were substantially the same as those provided by defendants' operation of EINRTP. Thus, *Mathis* establishes that *Burton* cannot be distinguished on this ground.

### C. *Propriety of Summary Adjudication*

■ Summary judgment is appropriate only where there is no genuine issue of material fact and, viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is entitled to prevail as a matter of law.[25] *MGM Grand*

---

**24.** *See also Chalfant v. Wilmington Institute,* 574 F.2d 739 (3 Cir. 1978) (*en banc*) (state action found in the operation of a free library, despite dissent's objection, 574 F.2d at 756, that the government and the library were not in a truly symbiotic relationship).

**25.** The federal action issue in this case arises in the context of a motion for partial summary judgment, rather than a motion addressing jurisdictional issues. The court notes, however, that in suits brought under 42 U.S.C. § 1983, state action has often been referred to as a jurisdictional matter. *See, e. g., Robinson v. Bergstrom,* 579 F.2d 401, 404 (7 Cir. 1978); *Spark v. Catholic University of America,* 167 U.S.App.D.C. 56, 510 F.2d 1277 (D.C.Cir. 1975). Although state action may be a prerequisite for federal jurisdiction under 28 U.S.C. § 1343, it is also an element of a Section 1983 claim. In *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), the Supreme Court addressed a state action issue in a case in which the district court had found that plaintiff's allegations of state involvement were insufficient "to confer jurisdiction upon a federal district court under 28 U.S.C. § 1343(3), or to state a claim under 42 U.S.C. § 1983." *Brooks v. Flagg Bros., Inc.,* 404 F.Supp. 1059, 1066–1067 (S.D.N.Y.1975) (footnote omitted). The Supreme Court stated that state action is an element of a Section 1983 claim, 436 U.S. at 155, 98 S.Ct. 1729, and held that "[t]he District

Court properly concluded that [the] complaints failed to state a claim for relief under 42 U.S.C. § 1983." 436 U.S. at 166, 98 S.Ct. at 1738.

In *Junior Chamber of Commerce v. United States Jaycees,* 495 F.2d 883 (10 Cir. 1974), *cert. denied,* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974), the Court of Appeals for the Tenth Circuit held that the allegations of the complaint were insufficient to establish federal action and concluded that the district court had properly dismissed the suit for failure to state a claim rather than for lack of subject matter jurisdiction. It noted that under *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), a federal court has jurisdiction to entertain a suit brought under 28 U.S.C. § 1331 unless the alleged federal claim is wholly insubstantial and frivolous or appears to have been made solely for the purpose of obtaining federal jurisdiction. 495 F.2d at 885–886. *Cf. Ripon Society v. National Republican Party,* 173 U.S. App.D.C. 350, 358–359 n. 26, 525 F.2d 567, 576–577 n. 26 (D.C.Cir. 1975) (*en banc*) *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976) (stating that in a § 1983 suit perhaps "a plaintiff asserting jurisdiction under § 1343(3) need only raise a substantial question as to the existence of state action" for jurisdiction to obtain). *See also Adams v. Southern California Nat'l Bank,* 492 F.2d 324, 338 (9 Cir. 1974), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325,

*Hotel, Inc. v. Imperial Glass Co.*, 533 F.2d 486, 488 (9 Cir. 1976), *cert. denied*, 429 U.S. 887, 97 S.Ct. 239, 50 L.Ed.2d 168 (1976). Since a determination whether state or federal action has been established depends on an analysis of the particular facts of each case, it has been suggested that summary adjudication of these issues is generally not appropriate. *See Braden v. University of Pittsburgh*, 552 F.2d 948, 966–967 (3 Cir. 1977) (*en banc*) (Garth, J., concurring). This Court agrees that the factual nature of the federal action inquiry may in many cases preclude summary adjudication of that issue. Yet in cases where the material facts are undisputed, the court may be able to "sift facts and weigh circumstances," as required by *Burton, supra*, 365 U.S. at 722, 81 S.Ct. 856, and reach the conclusion that federal action does or does not exist as a matter of law. *See Spark v. Catholic University of America, supra*, 167 U.S.App.D.C. at 60, 510 F.2d at 1281.

In this case, defendants generally have not disagreed with plaintiff's factual assertions but rather have disputed plaintiff characterization of the underlying facts and plaintiff's assessment of the legal significance of those facts. Defendant NEII argues that the undisputed material facts establish that defendants are entitled to an order granting summary judgment in their favor. The only areas of "factual dispute" identified by the defendants are actually gaps in the factual records.[26] Defendant IUEC points out that there is no evidence concerning the reason for the EINRTP citizenship requirement and argues that this is material to the resolution of the federal action issue, since it bears on whether the Manpower Administration affirmatively supported the citizenship requirement. The lack of evidence on this point does not af-

fect the Court's federal action ruling, however, for the Court has accepted defendants' contention that the Manpower Administration did not intentionally approve the citizenship requirement. The Court's finding of federal action is therefore premised on the *Burton* decision, rather than the *Jackson* "nexus test."

IUEC also notes that the record does not reveal the degree to which OFCC may have supervised EINRTP. Plaintiff might have provided additional support for his motion by producing evidence on this point. However, the undisputed facts concerning the Manpower Administration's relationship with EINRTP are sufficient to establish that the *Mathis* decision is controlling. The Court therefore must conclude that plaintiff has established the presence of federal action as a matter of law.

## II. *THE CONSTITUTIONALITY OF THE EINRTP CITIZENSHIP REQUIREMENT*

The second issue addressed in plaintiff's motion for partial summary judgment is whether EINRTP's citizenship requirement violated the Due Process Clause of the Fifth Amendment. Plaintiff asserts that the citizenship requirement was clearly unconstitutional. Defendants have not responded to this assertion in their briefs opposing plaintiff's motion. Nor have they submitted affidavits or deposition testimony explaining why the citizenship requirement was adopted. Since defendants have not even attempted to justify the exclusion of aliens from EINRTP, the Court must conclude that the citizenship requirement was unconstitutional. If a state had adopted such a rule and offered no explana-

---

42 L.Ed.2d 282 (1974); *Hines v. Cenla Community Action Comm., Inc.*, 474 F.2d 1052, 1059 (5 Cir. 1973) (Wisdom, J., dissenting).

In this case, plaintiff's contention that the operation of EINRTP involved federal action is certainly not insubstantial. Thus, the Court has jurisdiction under 28 U.S.C. § 1331, and may proceed to address the federal action issue as an element of plaintiff's Fifth Amendment claim. Since the Court is adjudicating the merits of plaintiff's claim, it is appropriate to con-

sider this a motion for summary judgment and to apply the standards set forth in Rule 56. *See Black v. Payne*, 591 F.2d 83, 86 n. 1 (9 Cir. 1979).

**26.** These gaps persist despite extensive discovery. Defendants have not contended that they are unable to refute plaintiff's factual assertions because they have not had an adequate opportunity to engage in discovery.

tion for it, the rule would be held unconstitutional under the strict scrutiny standard. Although the federal government may sometimes establish that overriding national interests justify a rule excluding aliens, even where a state could not have validly adopted such a rule, defendants have not made such a showing in this case.

The Supreme Court declared in *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971):

> "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority * * * for whom such heightened judicial solicitude is appropriate." 403 U.S. at 372, 91 S.Ct. at 1852 (footnotes and citation omitted).

Applying the strict scrutiny standard, the Court held that state statutes denying welfare benefits to resident aliens or to aliens who have not resided in the United States for a specified number of years violated the Equal Protection Clause of the Fourteenth Amendment. 403 U.S. at 376, 91 S.Ct. 1848. Relying on *Graham v. Richardson*, the Court subsequently declared invalid a state statute that prevented aliens from entering the state's competitive classified civil service, *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), and a state court rule that excluded aliens from the practice of law, *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). In *Examining Board v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976), the Court held unconstitutional a Puerto Rico statute that only permitted United States citizens to practice privately as civil engineers. The Court noted that its past decisions displayed particular solicitude for the rights of aliens where states had barred aliens from engaging in private occupations:

> "It is with respect to this kind of discrimination that the States have had the greatest difficulty in persuading this Court that their interests are substantial and constitutionally permissible, and that the discrimination is necessary for the safeguarding of those interests." 426 U.S. at 603, 96 S.Ct. at 2282.

The Court in *Flores de Otero* found the statute at issue "plainly unconstitutional" and concluded that it was unnecessary to determine whether the Fifth Amendment or the Fourteenth Amendment applied to residents of Puerto Rico, since the statute violated both constitutional provisions.

The Supreme Court has not applied the strict scrutiny standard to every state statute regulating employment of aliens. In *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), the Court concluded:

> "It would be inappropriate * * * to require every statutory exclusion of aliens to clear the high hurdle of 'strict scrutiny,' because to do so would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship.'" 435 U.S. at 295, 98 S.Ct. at 1070, *quoting Nyquist v. Mauclet*, 432 U.S. 1, 14, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (Burger, C. J., dissenting).

Although the Court's past decisions had extended to aliens "the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions," the Court stressed that the "right to govern is reserved to citizens". 435 U.S. at 297, 98 S.Ct. at 1071. Applying the rational basis test, the Court held that the State of New York could constitutionally exclude aliens from its police force, since the police function is "one of the basic functions of government." *Id.* Similarly, in *Ambach v. Norwick*, 439 U.S. 907, 99 S.Ct. 273, 58 L.Ed.2d 253 (1979), the Court applied the "governmental function" exception in holding that the State of New York had a rational basis for excluding those aliens who had not manifested an intention to apply for citizenship from teaching in the state's elementary and secondary schools.

The exclusion of aliens at issue in this case could not be viewed as falling within the "governmental function" exception. Thus, if this case involved exclusion of

aliens by a state governmental entity, the strict scrutiny standard adopted in *Graham v. Richardson, supra*, would apply. As noted in *Flores de Otero, supra*, restrictions on employment of aliens are particularly difficult to justify.

The EINRTP citizenship requirement created a substantial barrier for aliens wishing to enter the elevator construction and repair industry. According to the NEII/IUEC program proposal, incorporated into the 1973 contract with the Manpower Administration, NEII represents companies that employ more than 95% of the workers in the industry.[27] NEII and IUEC agreed in the 1972 collective bargaining agreement that all new and inexperienced employees would be hired and referred in accordance with the EINRTP program.[28] EINRTP required all new and inexperienced job applicants to complete a standardized application form and take a standardized pre-employment test.[29] The application form instructed applicants that they would be required to produce documentary proof of their United States citizenship before completing the form.[30] Applicants who received a passing score on the pre-employment test were placed on the local union's hiring list, ranked according to their test scores, and were hired in the order listed.[31] In addition to implementing standardized testing, EINRTP provided tutoring to prepare applicants for the pre-employment test and provided a training program designed to help the newly hired probationary employees pass the probationary helper test.[32] Thus, the EINRTP citizenship requirement prevented aliens who wished to enter the elevator industry from participating in EINTRP's training program and it also substantially foreclosed them from obtaining employment in the industry.

Since defendants have not provided any justification for this exclusion of aliens, it is clear that under the strict scrutiny test the EINRTP citizenship requirement would be held invalid. Although *Graham v. Richardson, supra, Sugarman v. Dougall, supra*, and *In re Griffiths, supra*, were decided under the Equal Protection Clause of the Fourteenth Amendment, while plaintiff in the instant case relies on the Due Process Clause of the Fifth Amendment, the Supreme Court has recognized that

> "the Due Process Clause of the Fifth Amendment authorizes [a traditional equal protection analysis] of federal rules and therefore * * * the Clause has a substantive as well as a procedural aspect." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976).

*See also Flores de Otero, supra*, 426 U.S. at 601 & n. 33, 96 S.Ct. 2264. However, the protection afforded by the Fifth Amendment is not always coextensive with that afforded by the Fourteenth Amendment, since "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." *Hampton v. Mow Sun Wong, supra*, 426 U.S. at 100, 96 S.Ct. at 1904.

In *Hampton, supra*, the Court considered the constitutionality of a Civil Service Commission regulation excluding non-citizens from the vast majority of federal civil service positions. Although the Court conceded that overriding national interests might be served by such a rule, it concluded that due process required that certain "essential procedures" be followed before the Court considered whether overriding national in-

---

**27.** June 22, 1973 contract between EINRTP and the Manpower Administration, at 22.

**28.** Standard Agreement between NEII and IUEC, dated March 24, 1972 to July 8, 1977, at 72.

**29.** Outline of the EINRTP program, prepared by EINRTP's National Directors, at 2–3.

**30.** *Id.* at 3.

**31.** June 22, 1973 contract between EINRTP and the Manpower Administration, at 28.

Apparently, extra points were added to the test scores of applicants who were veterans. *See* Outline of the EINRTP program, prepared by EINRTP's National Directors, at 3.

**32.** June 22, 1973 contract between EINRTP and the Manpower Administration, at 29–31.

terests might justify a rule excluding aliens that would be invalid if adopted by a state:

" * * * [D]ue process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest. If the agency which promulgates the rule has direct responsibility for fostering or protecting that interest, it may reasonably be presumed that the asserted interest was the actual predicate for the rule. That presumption would, of course, be fortified by an appropriate statement of reasons identifying the relevant interest. Alternatively, if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption." 426 U.S. at 103, 96 S.Ct. at 1905.[33]

Earlier in this proceeding, defendant IUEC moved to dismiss for failure to state a claim, arguing that overriding national interests justified the EINRTP citizenship requirement. IUEC contended that the Department of Labor, acting within the scope of its delegated authority, had authorized the exclusion of non-citizens from EINRTP. Based on the allegations of the complaint, IUEC concluded that the Department of Labor "when it reviewed the proposal for EINTRP [had] determined that a requirement of United States citizenship should be included." [34] IUEC argued that since the Department of Labor is concerned with such matters as the economic consequences of employment of aliens in various parts of the national labor market, the agency's approval of the EINRTP citizenship requirement met the test set forth in *Hampton.* The Court denied IUEC's motion to dismiss,

noting that even assuming *arguendo* that the Department of Labor had the institutional authority to direct EINRTP to exclude aliens from the program, the Court could not conclude on the basis of the pleadings that it had done so. Furthermore, "[w]ithout any allegations, much less evidence, about the reasons for the rule excluding aliens, the Court [could not] be satisfied beyond doubt that any 'overriding national interest' justifie[d] the rule." [35]

Defendants now argue in their briefs opposing plaintiff's motion for partial summary judgment that the Department of Labor did not authorize, approve, or encourage EINRTP's citizenship requirement. In fact, NEII states that at most the record shows a mistaken approval of the citizenship requirement, which was rectified as soon as the Department of Labor became aware of the mistake. Rodger Coyne testified at his deposition that the exclusion of aliens conflicted with Manpower Administration policy and was prohibited by CETA regulations.[36] Thus, defendants' arguments regarding the federal action issue have undercut IUEC's earlier contention that the Department of Labor, acting within the scope of its institutional authority, had determined that the national interest required exclusion of aliens from EINRTP.

Since EINRTP's rule denying employment opportunities to aliens would violate the Equal Protection Clause if adopted by a state, and since defendants have not established that overriding national interests justified the rule, the Court finds that EINRTP's citizenship requirement violated the Due Process Clause of the Fifth Amendment.

**33.** Subsequent to the Supreme Court decision in *Hampton,* the President by executive order amended Civil Service Rule VII to provide explicitly for exclusion of aliens from the civil service, except in limited circumstances where necessary for efficiency of the service. On remand, the district court held that the President had the power to promulgate the executive order and that the order did not conflict with the Due Process Clause of the Fifth Amendment. *Mow Sun Wong v. Hampton,* 435 F.Supp. 37 (N.D.Cal.1977), *appeal docketed,* No. 77–2649, 9 Cir. April 28, 1977. *Accord,*

*Vergera v. Hampton,* 581 F.2d 1281 (7 Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979).

**34.** Memorandum of Points and Authorities in Support of Motion to Dismiss, filed August 30, 1977, at 12.

**35.** Memorandum of Opinion, filed May 25, 1978, at 5.

**36.** *See* n. 18 and accompanying text *supra.*

## III. PLAINTIFF'S EXCLUSION FROM EINRTP

The final element necessary to establish liability is that plaintiff was excluded from EINRTP on the basis of the citizenship requirement. There seems to be no dispute on this point. EINRTP rules required applicants to produce proof of citizenship before taking the pre-employment test.[37] However, in April 1974, six individuals who were unable to produce proof of citizenship, including plaintiff, were permitted to take the test in San Francisco, within the jurisdiction of Local 8.[38] Having achieved a qualifying score on the test, plaintiff was placed on Local 8's hiring list but was later removed because of the EINRTP citizenship requirement.[39] Although the extent of the damage suffered by plaintiff as a result of this removal has not yet been proven, the record in this case does establish that plaintiff was excluded from EINRTP because he was not a citizen. Accordingly, plaintiff's motion for partial summary judgment on the issue of liability is granted.

IT IS HEREBY ORDERED that plaintiff's motion for partial summary judgment, seeking an adjudication that defendants violated plaintiff's rights under the Due Process Clause of the Fifth Amendment, is granted.

IT IS HEREBY FURTHER ORDERED that a status conference will be held in this action on July 30, 1979, at 9 A.M.

---

**37.** See n. 29 and accompanying text, supra.

**38.** See April 19, 1974 letter from Hector Rueda, business manager of Local 8, to the National Co-Directors of EINRTP, submitted in support of plaintiff's motion for partial summary judgment:

"I may point out to you that [five names omitted and] John P. de Malherbe are not citizens but demanded to take the test. Rather than jeopardize all the applicants that have already been taken and be forced, at a later date to give the examination again, we allowed them to take the test with the understanding that their placing on the eligible list would be pending approval of the National Office."

See also May 2, 1977 letter from Joyce Mader, counsel to IUEC, to Stephen Naiman, counsel to IUEC and Local 8, submitted in support of plaintiff's January 25, 1979 motion to compel further responses to interrogatories:

"In April, 1974, Local Union No. 8 of the International Union of Elevator Constructors, San Francisco, California (Local 8) permitted six persons who were unable to produce proof of United States citizenship, including Plaintiff, John De Malherbe, to complete the application form and to take the pre-employment test. One of these persons failed [to] achieve the minimum qualifying score on the pre-employment test and for that reason was not placed on the hiring list."

**39.** See defendant IUEC's memorandum opposing plaintiff's motion to compel further responses to interrogatories, filed February 28, 1979, at 1:

"The IUEC is willing to stipulate that Plaintiff John De Malherbe was removed from the referral list maintained within the jurisdiction of IUEC Local No. 8 as a result of the citizenship requirement of EINRTP."